Filed 5/23/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARVIN B. GRAHAM, | D063779 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-1012-00051304) |
| BANK OF AMERICA, N.A., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Judge. Affirmed.

Law Offices of Thomas Gillen, Thomas W. Gillen and Richard L. Barthel for Plaintiff and Appellant.

Bryan Cave, Stuart W. Price, Sean D. Muntz, Allan P. Bareng and Jigar S. Vakil for Defendants and Respondents.

INTRODUCTION

Marvin B. Graham borrowed money to purchase a house in 2004. Approximately seven years later, he defaulted on his loan and received a notice of sale. Graham filed this action to halt foreclosure proceedings and to cancel the note. He contends the "defendants' Lending Personnel"[1] made fraudulent misrepresentations or omissions by stating the appraised fair market value of his home in 2004 was "increasing" and that the loan was "good for [him]," while allegedly knowing the appraisal was "outrageously speculative." Taking issue with industry-wide mortgage banking practices, Graham seeks to hold the defendants responsible for the decline in his property value as well as the collapse of the real estate market.

Graham appeals a judgment of dismissal after the court sustained a demurrer to his second amended complaint (SAC) without leave to amend. He contends he sufficiently alleged facts to support his causes of action for fraud and deceit, violations of Business and Professions Code section 17200[2] and declaratory relief. He also contends it was an abuse of discretion to deny further leave to amend. We affirm.

---

[1] Graham defines "defendants' Lending Personnel" (Lending Personnel) as "a lending team" composed of "people identified as vice-president, or manager, or as an appraiser or as a broker, or a loan officer, or a loan processor, or employee of some type authored [sic] to create and process loan documents." Graham alleges he does not remember the names of these individuals even though their names and titles appeared on business cards and name tags affixed to their clothing. He contends their identities are "more readily in the knowledge of defendants."

[2] All further statutory references are to the Business and Professions Code unless otherwise noted.

FACTUAL AND PROCEDURAL BACKGROUND

We derive the facts from the complaints and the documents of which the court took judicial notice.[3] (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.)

I

*The Loans*

Graham borrowed $391,200 in 2004 from First Franklin Financial Corporation (First Franklin) to purchase a home in Vista, California for $489,000. A deed of trust on the property secured the loan in first priority. He obtained a second loan for $97,800, secured by the property in second priority. American National Lending, Inc., (American National) was the loan broker for the transaction. American National's appraiser assessed the fair market value of the property at the time at $525,000.

In 2011 after Graham fell behind in his payments, First Franklin substituted ReconTrust Company, N.A. (ReconTrust)[4] a subsidiary of Bank of America, N.A. (BofA) as the trustee and assigned its interests under the deed of trust to "Deutsche Bank National Trust Company as trustee for the certificate holders of the FFMLT 2005 FF2

_____

[3]     The court granted defendants' request for judicial notice of five documents recorded with the San Diego County Recorder's Office: (1) deed of trust recorded on December 30, 2004; (2) substitution of trustee recorded on October 27, 2011; (3) corporation assignment of deed of trust recorded on October 27, 2011; (4) notice of default and election to sell recorded on October 27, 2011; and (5) notice of trustee's sale recorded on February 13, 2012.

[4]     ReconTrust is erroneously sued as "Reconstruct Co. NA."

Trust, mortgage pass-through certificates, series 2005-FF2 (Deutsche Bank)."

ReconTrust recorded a notice of default and election to sell indicating he owed more than

$100,000 for past due payments and costs. Several months thereafter, ReconTrust sent a

notice of trustee's sale indicating an intention to sell the property at auction.

II

*The Pleadings*

A

In 2012 Graham sued BofA, ReconTrust, Deutsch Bank, First Franklin and

American National (collectively defendants).[5] The original complaint set out

"preliminary facts" describing changes in mortgage banking practices from 2001 to 2008,

which allegedly affected home values by driving prices up before they collapsed in 2007.

Graham alleged the defendants knew the $525,000 appraisal for his house was

speculative and they falsely represented the value of the home would appreciate to permit

a sale or refinance at a substantial profit before adjustable rate mortgage payments were

required. He asserted causes of action for (1) fraud, negative fraud, and deceit, (2) an

order terminating foreclosure proceedings and cancellation of the notes, and (3) violation

of section 17200.

Graham amended his original complaint after defendants filed a demurrer. He

alleged identical "preliminary facts" and nearly identical allegations for the fraud cause of

---

[5]     American National is not a party to this appeal. According to Graham, the
corporation is dissolved.

4

action, but in the section 17200 cause of action he added allegations the defendants failed to disclose "the true cost of the loan" and "negative features of [adjustable-rate mortgage (ARM)] loans" and they misrepresented the "true value of the home" and "using the lure of early low monthly payments induced [Graham] to execute a loan package that clearly was not needed nor good for him." He contended the Lending Personnel were "equally complicit in their lending practices in approving the $489,000 loan package without regard to the actual fair market value" of the home.

Graham attached to the first amended complaint (FAC) the consent judgment entered against five institutional lenders, including BofA, to settle a suit filed by the federal government and 49 states, including California, regarding mortgage foreclosure and modification practices. Graham requested declaratory relief "as to the applicability of the Settlement to the terms of [his] home loan and how the present litigation should proceed in the face of the provisions outlined in the national Settlement."

Defendants demurred arguing the FAC did not state a cause of action for fraud, negative fraud or deceit because Graham failed to plead the elements of fraud with sufficient specificity. Defendants argued the FAC did not state a cause of action for violation of section 17200 because the fraud claims fail and Graham did not plead facts demonstrating a violation of a constitutional, statutory or regulatory provision to render the alleged conduct "unfair." Defendants additionally argued Graham lacks standing because he has not "lost money or property." Defendants also asserted Graham is not entitled to declaratory or injunctive relief because he did not allege a present and actual

5

controversy or the necessary elements for injunctive relief. The court sustained the demurrer with leave to amend.

B

Graham filed a second amended complaint (SAC) with substantial changes.[6] The SAC alleges four causes of action: (1) negative fraud and deceit and affirmative fraud; (2) violation of section 17200; (3) legal and equitable relief based on fraud and public policy against defendants; and (4) declaratory relief.

The SAC includes additional "preliminary facts" purporting to outline historical procedures of home financing since 1945 and asserting legal arguments about how

---

[6] We disregard many of the additions to the SAC, which appear to be irrelevant imports from pleadings in other cases, because we may disregard allegations that are contrary to facts of which judicial notice may be taken (*Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 180) and allegations that conflict with factual allegations in prior complaints. (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957.) To illustrate, Paragraph 12 of the SAC refers to a 2007 loan agreement, whereas Graham entered into the loan and deed of trust in 2004. Paragraphs 20 and 26 refer to the 2008 purchase of Countrywide by BofA and conduct by "Countrywide folks" whereas First Franklin was the loan originator for Graham's loan. Paragraph 47 states "defendant Countrywide" made a 2007 statement to investors about board-based declines in housing values at "the same time" representations were made to plaintiff, but Graham's loan originated in 2004. Additionally, the SAC alleges Lending Personnel did not advise plaintiff the loan would be "pre-scheduled and sold immediately upon execution of the loan" or that "MERS" (presumably Mortgage Electronic Registration Systems, Inc.) would be the controlling entity per the deed. The record before us does not indicate MERS has any involvement in this transaction. The deed of trust identifies lender First Franklin as the beneficiary and the trustee as Commonwealth Land Title Company. While the deed of trust permits the lender to sell the note or partial interest in the note without prior notice to the borrower and to appoint a successor trustee, the assignment of the deed of trust to Deutsche Bank and the substitution of trustee to ReconTrust did not occur until after Graham defaulted on the loan, seven years after origination of the loan.

financial institutions have "destroyed the home financing methodology" by various practices such as "fragmentation and repacking" of notes and substitutions of trustees on deeds of trust. According to Graham, this conduct along with conduct of the Federal Reserve, Congress, Fannie Mae, Freddie Mac, and government-sponsored entities caused average national home values to appreciate from 5 percent per year in the late 1990s to 15 percent per year before collapsing in 2007. He alleges the "financial elite" knew the potential for disaster based upon warnings from government officials, calls for legislation and other events from 2001 through 2008. While Graham cites publically available information, he alleges he could not have suspected the pending collapse of the real estate market because the market was the victim of "financial engineering" and a "Wall Street ponzi scheme" and defendants, as well as others, were "players, engineers, and manipulators in this endemic and collusive fraud on California homeowners."

Graham alleges the Lending Personnel made the following representations related to his loans: (a) the home had an "increasing and revised upwards—value of $525,000"; (b) such was the fair market value (FMV) of the home; (c) such "rapid increase in the FMV" of the home "demonstrated the security of the purchase"; (d) the FMV of the home "was ever-increasing, such that the [home] could be 'turned for a profit' in the near future, or refinanced to obtain better terms"; (e) the loan was "good" for Graham when defendants knew the $525,000 appraisal was speculative. He alleges the $525,000 appraisal was false because it was an "artificially inflated and engineered rate that was impossible to justify by any historical data" and "the appraiser justified the valuation by the use of comparable sales, which were all tainted by the activities described . . . [and]

7

were . . . part of the pervasive industry-wide fraud."  In addition, Graham alleges Lending Personnel knew he planned to keep the home for a long time and did not intend to sell or "flip" the house for a profit.  He also alleges the Lending Personnel knew he was an unsophisticated borrower, his loan was "unsustainable," he "would not be able to pay back such loan" and they "steamroll[ed] the loan transaction" even though they knew the loan was misaligned with Graham's stated interests.

In the second cause of action for violation of section 17200, Graham alleges the same representations regarding the appraised value of the property constitute unlawful, unfair or fraudulent business practices.  He also makes generalized allegations regarding industry-wide business practices contending the defendants:  (1) created "mass loans for profit"; (2) colluded with other institutional lenders, appraisers and credit rating agencies "to monetize and support the entire lending industry's ruse/hoax of an ever-increasing and expanding real estate market"; (3) created and used MERS "as a straw-man entity" and "to circumvent and unseat the real property recording requirements"; (4) engineered a system of splitting up deeds from notes to "subvert[] the integrity of the judicial system and real property recording system" to rely exclusively on the deed to "perpetrate foreclosure"; (5) foreclosing on homes "with no cause, with defective notice, with improper purpose, without proper authority"; and (6) participated in "[d]ual tracking" in which lending institutions undertake loan modification negotiations while, soon thereafter, taking steps toward foreclosure.

The third cause of action alleges the promissory notes are void and the deeds should be rescinded based upon the alleged fraud.  The fourth cause of action seeks

8

declaratory relief ordering defendants take nothing by the notes or the deeds due to alleged "fraud, unconscionability and . . . [s]tatutory violations" and to refinance the property as required by the National Mortgage Settlement.

III

*Ruling on Demurrer*

The court sustained the defendants' demurrer to the SAC without leave to amend, ruling there is no basis for the first cause of action for fraud or deceit because an appraisal is an opinion rather than a statement of fact and plaintiff failed to show justifiable reliance on "a speculative appraisal." The court also ruled the SAC fails to allege fraudulent misrepresentations or omissions with sufficient specificity.

As to the second cause of action, the court ruled Graham alleged insufficient facts to demonstrate unlawful business practices or to show the defendants engaged in unfair business practices in violation of section 17200. "[A] speculative appraisal does not support plaintiff['s] cause of action for fraud and consequently fails to support plaintiff['s] second cause of action for unfair business practices in violation of [section] 17200." The court found Graham does not allege facts to support a fraud claim under section 17200 because he does not "plead facts establishing a misrepresentation that would deceive consumer, fails to plead facts showing actual reliance, and fails to plead [the] defendants' actions caused him injury." The court found no unfair business practices based upon allegations of splitting the note from the deed of trust because the mortgage follows the note. The court also noted Graham lacks standing because he cannot establish the required element of harm since the trustee's sale has not yet occurred.

9

As to the third cause of action, the court found no basis for legal and equitable relief based on fraud or violation of public policy because Graham alleges no facts showing the note or home equity line of credit were procured by fraud, accident or mistake.  Additionally, Graham is not entitled to rescission because he does not allege he either has tendered or has the ability to tender the amount due under the loan.  The court also ruled there is no basis for injunctive relief because Graham did not allege facts that would prohibit enforcement of the terms of the deed of trust.[7]

The court ruled the fourth cause of action for declaratory relief fails because Graham does not allege a justiciable controversy.

DISCUSSION

I

*Standard of Review*

On appeal from a judgment after a demurrer is sustained without leave to amend, we review the order de novo and exercise our independent judgment on whether the complaint states a cause of action as a matter of law.  (*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co.* (2006) 137 Cal.App.4th 905, 911.)  We assume the truth of all properly pleaded material facts, as well as facts inferred from the pleadings and those of which judicial notice may be taken.  (*Howard Jarvis Taxpayers Assn. v. City of La Habra*, *supra*, 25 Cal.4th at p. 814.)  However, we do not assume the truth of contentions,

---

[7]     On appeal, Graham does not challenge the court's ruling on the third cause of action.  Nor does Graham challenge the finding of no unfair business practices based on allegations of splitting the note from the deed.

10

deductions or conclusions of fact or law (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6) and we disregard allegations contrary to the law or to a fact of which judicial notice may be taken. (*Brenereic Associates v. City of Del Mar*, *supra*, 69 Cal.App.4th at p. 180.)

II

*Graham Does Not State a Cause of Action for Fraud or Deceit*

Graham contends the SAC sufficiently alleges the elements necessary to state a claim for what he refers to as negative fraud and deceit or affirmative fraud. We disagree.

A

"To establish a claim for fraudulent misrepresentation, the plaintiff must prove: '(1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff.' " (*Perlas v. GMAC Mortgage, LLC* (2010) 187 Cal.App.4th 429, 434 (*Perlas*), italics omitted.)

The required elements for fraudulent concealment are: (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or

11

suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact. (*Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 870 (*Bank of America Corp.*).)

B

Here, Graham's allegations of misrepresentations and/or concealment center on the appraisal. Graham alleges defendants represented: (a) the home had an "increasing and revised upwards—value of $525,000"; (b) such was the fair market value (FMV) of the home; (c) such "rapid increase in the FMV" of the home "demonstrated the security of the purchase"; (d) the FMV of the home "was ever-increasing, such that the [home] could be 'turned for a profit' in the near future, or refinanced to obtain better terms"; and (e) the loan was "good" for Graham. Graham alleges the representations about the appraised value of the property were false because the appraisal was an "artificially inflated and engineered rate." He admits "the appraiser justified the valuation by the use of comparable sales," but alleges the comparable sales were "tainted" by what Graham alleges is part of a "pervasive industry-wide fraud."

Statements regarding the appraised value of the property are not actionable fraudulent misrepresentations. Representations of opinion, particularly involving matters of value, are ordinarily not actionable representations of fact. (*Neu-Visions Sports Inc. v. Soren/McAdam/Bartells* (2000) 86 Cal.App.4th 303, 308 (*Neu-Visions*) [accountant's opinion of the value of a building not actionable misrepresentation of fact]; *Padgett v.*

12

*Phariss* (1997) 54 Cal.App.4th 1270, 1284 [opinion of fair market value of property not actionable misrepresentation].)  A representation is an opinion " 'if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value . . . or other matters of judgment.' "  (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 774, p. 1123.)

Appraisals are "an opinion as to the market value" of a property prepared by a qualified independent appraiser.  (12 C.F.R. §§ 34.42(a), 34.45 (2014); 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 498, p. 576.)  It is an estimate of the price a buyer would be willing to pay and a seller would be willing to accept at a given time based upon market conditions.

An appraisal is performed in the usual course and scope of the loan process to protect the *lender's* interest to determine if the property provides adequate security for the loan.  Since the appraisal is a value opinion performed for the benefit of the lender, there is no representation of fact upon which a buyer may reasonably rely.  "While it [is] foreseeable the appraisal might be considered by plaintiff in completing the loan transaction, the foreseeabilty of harm [is] remote.  Plaintiff [is] in as good a position as . . . defendant to know the value and condition of the property.  One who seeks financing to purchase real property has many means available to assess the property's value and condition, including comparable sales, advice from a realtor, independent appraisal, contractors' inspections, personal observation and opinion and the like.  . . . Stated another way, the borrower should be expected to know that the appraisal is intended for the lender's benefit to assist it in determining whether to make the loan, and

13

not for the purpose of ensuring that the borrower has made a good bargain, i.e., not to insure the success of the investment." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1099.)

Similarly, Graham does not allege actionable misrepresentations based on allegations the defendants told him the loan was "good" for him or the market would "increase" and allow him to turn it for a profit. Such statements are merely opinions or predictions about future events, they are not factual representations.

Predictions about a buyer's real estate investment or the fair market value for property in the future are not actionable misrepresentations. " 'It is hornbook law that an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions.' " (*Neu-Visions*, *supra*, 86 Cal.App.4th at pp. 309-310.) " '[A]bsent special circumstances . . . a loan transaction is at arm's length and there is no fiduciary relationship between the borrower and lender.' [Citations.]' [Citation.] A commercial lender pursues its own economic interests in lending money." (*Perlas*, *supra*, 187 Cal.App.4th at p. 436.) A loan agreement does not require the lender to protect the success of a borrower's investment. (*Nymark v. Heart Fed. Savings & Loan Assn.*, *supra*, 231 Cal.App.3d at p. 1096.) A borrower must rely on his or her own judgment and risk assessment to decide whether to accept a loan. (*Perlas*, at p. 436.)

Graham actually alleges he did not rely on representations regarding a quick increase in value or that he could turn a profit because he had no intention of selling or "flipping" the home. Instead, he intended to keep the home for a long time. Further,

14

Graham alleges publically available information existed from 2001 and through 2004 (when he entered into the transaction), which debated the stability of the housing industry. Therefore, the court correctly determined Graham does not allege either actionable fraud or reasonable reliance on defendants' alleged opinions or predictions.

C

Finally, even if we were to find an actionable representation or omission, Graham does not allege the necessary element of causation. For active misrepresentation, a plaintiff must plead and prove reliance on the representation was a substantial factor in causing harm to the plaintiff. (*Perlas*, *supra*, 187 Cal.App.4th at p. 434.) For fraudulent concealment, the plaintiff must plead and prove he or she sustained damage as a result of the concealment or suppression of fact. (*Bank of America Corp.*, *supra*, 198 Cal.App.4th at p. 873.) Graham does not make that showing here.

Graham alleges the representations or omissions were made with an intent to defraud him by inducing him to finance his home with an ARM loan, which "could then be quickly marketed to Wall Street and its international investors and bring revenue to defendants." He also alleges (1) the current value of his home is less than the appraised value, (2) his damages include his "initial contribution" to consummate the loan and (3) there is a "clear and present prospect of losing the home to foreclosure."

However, Graham does not allege a sufficient nexus between the alleged misrepresentations or concealment and his alleged economic harm. (*Bank of America Corp.*, *supra*, 198 Cal.App.4th at p. 873.) In *Bank of America Corp.,* the court observed, "homeowners who did not obtain loans from [defendants] likewise suffered a decline in

15

property values, a decline in their home equity, and reduced access to their home equity lines of credit. Irrespective of whether a homeowner obtained a loan from [defendants], or obtained a loan through another lender, or whether a homeowner owned his or her home free and clear, all suffered a loss of home equity due to the generalized decline in home values." (*Ibid*.)[8]

Similarly here, the damages Graham alleges he incurred are the result of a decline in the overall market. He alleges the market rate at the time of his loan was artificially inflated. He does not allege he could have or would have obtained a better loan from a different lender absent the alleged representations regarding the appraisal. Nor does he allege he would not have entered the market absent the alleged representations or omissions. He received the benefit of his bargain by obtaining a loan to purchase his home. An initial contribution and fees would have been necessary to obtain any loan at the time. The risk of property loss from foreclosure is the result of Graham's default on the loan, not the alleged conduct by defendants. Therefore, Graham has not sufficiently pleaded a causal connection between any damages and any actionable conduct by the defendants in entering into the loan agreement.

---

[8]     The *Bank of America Corp*. court also rejected the argument that lenders were required to disclose to borrowers any alleged intent to defraud investors by selling loans to mortgage pools at inflated values, which allegedly resulted in depression of the real estate market. While the court concluded the lender had a duty to refrain from committing fraud, it did not have a duty to borrowers to disclose its post-loan activities. (*Bank of America Corp*., *supra*, 198 Cal.App.4th at pp. 871-873.)

16

III

*Graham Does Not State a Cause of Action for Violation of the*
*California Unfair Competition Law*

A

The California Unfair Competition Law defines (UCL) (§ 17200) " 'unfair competition' as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' " (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.) A UCL action " 'is not an all-purpose substitute for a tort or contract action.' [Citation.] Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. . . . [T]he 'overarching legislative concern [was] to provide a streamlined procedure for prevention of ongoing or threatened acts of unfair competition.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1150.) As a result, the remedies available to private individuals for violation of the UCL are limited to restitution and injunctive relief; damages cannot be recovered. (*Id.* at pp. 1144, 1150; § 17203.)

Because the statute " 'is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).) Graham does not state a cause of action under any of the three varieties.

B

"By proscribing 'any unlawful' business act or practice [citation], the UCL ' "borrows" ' rules set out in other laws and makes violations of those rules independently actionable." (*Zhang v. Superior Court*, *supra*, 57 Cal.4th at p. 370.) A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." (*Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1554.)

In this case, the SAC does not allege a violation of law to support a UCL claim. The trial court correctly determined the defendants cannot be held liable for unlawful business practices where there is no violation of another law. (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 938.)

Instead, Graham asserts in his opening brief the "SAC alleges sufficient facts that are capable of supporting a claim for unlawful business practices." For the first time on appeal, Graham contends "[a]mong the potential violations of law that could reasonably be found when the [SAC] is interpreted in the light most favorable to Appellant are violations of 12 [Code of Federal Regulations part] 34 et seq."

" 'When a demurrer is sustained without leave to amend the [plaintiff] may advance on appeal a new legal theory why the allegations of the [complaint] state a cause of action.' " (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259.) However, the allegations here do not support a cause of action based on this new theory. Neither the SAC nor Graham's contentions on appeal demonstrate unlawful conduct. Graham contends the application of "highly speculative appraisal methods to justify the *highest possible* [FMV] for the Property, rather than the *most probable* [FMV]" did not

18

conform with 12 Code of Federal Regulations parts 34.42(g) and 34.44 (2014). This argument acknowledges the appraisal was within the market value range, even if it fell on the high end of the range. Further, the SAC admits the appraisal used comparable sales, which is permitted by the regulations.[9] At best, the SAC alleges the market itself was inflated, not that the appraisal violated the law. Therefore, there is no basis for a UCL claim based on unlawful conduct.

C

Graham's opening brief contends the SAC supports a claim for "unfair" business practices by claiming generally defendants "engaged in the type of business practices that contributed to an artificial inflation of real estate values, defrauding homeowners, investors, and government officials, and ultimately leading to the collapse of the housing market." He also contends defendants used "highly speculative appraisal methods to support unnecessarily large variable rate loan packages, luring consumers such as

---

[9]     An appraisal is required to conform to "generally accepted appraisal standards as evidence by the Uniform Standards of Professional Appraisal Practice" and, among other things, be based upon the market value. (12 C.F.R. § 34.44 (2014).) The federal regulations governing appraisals define market value as "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: [¶] (1) Buyer and seller are typically motivated; [¶] (2) Both parties are well informed or well advised, and acting in what they consider their own best interests; [¶] (3) A reasonable time is allowed for exposure in the open market; [¶] (4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and [¶] (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale." (12 C.F.R. § 34.42(g) (2014).)

19

Appellant, with low initial teaser rates that allowed for affordable monthly payments, promising that future refinancing will be available to avoid making increased monthly payments."

To support these conclusory charges, Graham cites record references spanning more than 20 pages of his 26-page complaint.  These block citations do not comply with California Rules of Court, rule 8.204(a)(1)(C) and frustrate the court's ability to evaluate the party's position.  (*Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694, fn. 1.)

With no record references, Graham generally contends, after consumers realize substantial negative equity, payments increase "beyond a sustainable debt to income ratio" and consumers "are forced to exhaust whatever savings they may have in order to satisfy their obligations to financial institutions . . . in hopes of avoiding foreclosure" while the defendants earn "a windfall by cash payments, seizure of the property secured by the loans, and compensation from government guarantees when the buyer finally defaults on the loan."  We disregard these contentions as not adequately supported by the record.  (*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 846.)

Even overlooking these briefing irregularities, the SAC does not support a claim for "unfair" business practices.  The standard for determining what business acts or practices are " 'unfair' " under the UCL for consumer actions remains unsettled.  (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 380, fn. 9.)  In *Cel-Tech*, the Supreme Court addressed the term "unfair" in the context of actions between competitors alleging anti-competitive practices, but it broadly criticized previous attempts to define "unfair" as "too

20

amorphous" to provide guidance. (*Cel-Tech*, *supra*, 20 Cal.4th at pp. 184-185.) Previously, courts defined "unfair" as a practice that offends public policy or " 'is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers' " or required courts to " ' "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." ' " (*Ibid.*)

The *Cel-Tech* court concluded it must "require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition" and, in actions challenging a direct competitor's "unfair" act, defined the term as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech*, *supra*, 20 Cal.4th at pp. 186-187.)

Thereafter, the appellate courts split regarding the definition of "unfair" business practices in consumer action. We described this split in the case of *In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1417-1418:

"One line of cases applied a pre-*Cel-Tech* balancing test for determining whether a business practice is unfair, under which the court examines the practice's ' " 'impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]' . . . [A]n 'unfair' business practice occurs when that practice 'offends an established public policy or when the

21

practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " ' [*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718-719.]

"A second line of cases adopted the following test or factors for determining unfairness set forth in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n): '(1) [t]he consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.' [*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.]

"A third line of cases, represented by *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845 (*Gregory*), applied a more rigorous test for unfairness in consumer UCL actions. The *Gregory* court disagreed with the balancing test applied by courts before *Cel-Tech*, stating: '*Cel-Tech* . . . may signal a narrower interpretation of the prohibition of unfair acts or practices in *all* unfair competition actions and provides reason for caution in relying on the broad language in earlier decisions that the [*Cel-Tech*] court found to be "too amorphous." Moreover, where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.' "

This court has consistently followed the *Gregory*, *supra*, 104 Cal.App.4th 894 line of cases and has held a plaintiff alleging an unfair business practice must show the "defendant's 'conduct is tethered to an[] underlying constitutional, statutory or regulatory

22

provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law.' " (*Wilson v. Hynek* (2012) 207 Cal.App.4th 999, 1008, quoting *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1366.)

Without acknowledging these authorities, Graham relies on the pre-*Cel-Tech* definition of "unfair" by asserting the utility of the defendant's conduct must be weighed against the gravity of the harm to the alleged victim. We decline Graham's invitation to apply this test.

Graham does not allege the defendants' conduct related to his loan processing was "unfair" because he does not allege any statements about the appraisal or opinions about the possible future value of the home constitute conduct tethered to a violation of a constitutional, statutory or regulatory provision. (*Wilson v. Hynek*, *supra*, 207 Cal.App.4th at p. 1008.)

D

The fraud prong of the UCL may be shown if members of the public are " ' "likely to be deceived." ' " (*Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 986.) However, " '[a]bsent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL.' " (*Id.* at p. 987.) Additionally, the UCL "imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 326.) In other words, the plaintiff "must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 327, fn. 10.)

23

Graham's allegations are based on the appraisal and his claim that defendants failed to disclose the "speculative" nature of the appraisal. For the reasons stated in part II.B., *ante*, we conclude the defendants did not owe Graham a duty to disclose related to the appraisal, which was undertaken for the benefit of the lender, or to guarantee the success of Graham's investment. Therefore, he does not adequately state a claim for a fraudulent business practice under the UCL. (*Levine v. Blue Shield of California* (2010) 189 Cal.App.4th 1117, 1136.)

E

Finally, even if we were to assume the defendants' actions violated one of the UCL's unfair competition prongs, Graham does not allege facts demonstrating he has standing to sue under the UCL because he does not allege sufficient facts showing a causal link between the alleged UCL violations and an injury in fact resulting in loss of money or property. (§ 17204; *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 326 [plaintiff required to show "causal connection" between economic injury and alleged UCL violation].)

As discussed in part II.C., *ante*, Graham alleges his property value declined as a result of an overall decline in the market; he does not allege a correlation between his property value decline and defendants' alleged conduct related to the appraisal value. He does not allege he would not have incurred loan origination contribution costs or fees had he borrowed from another lender. Finally, his prospect of losing the home to foreclosure is the result of default, not the alleged conduct of defendants. (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 522-523 [nonjudicial foreclosure

24

proceedings triggered by default are not economic injury caused by UCL violations]; *Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1099 [causation requirement of UCL not met if plaintiff would have suffered "the same harm whether or not a defendant complied with the law"].)

IV

*Graham is Not Entitled to Declaratory Relief*

Graham contends on appeal he is entitled to a declaration of rights on two grounds: (1) whether the defendants have complied with their obligations under the National Mortgage Settlement and asking the court to "order defendants to refinance the property with a fully amortized 30-year, or more, fixed interest rate loan in an amount [that] reflects the current, fair, and true market value of the real property", and (2) whether the note and deed are not enforceable because the loan agreement was unconscionable.

Declaratory relief is available to "[a]ny person interested under a written instrument . . . who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property . . . in cases of actual controversy relating to the legal rights and duties of the respective parties . . . ." (Code Civ. Proc., § 1060; *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 728 (*Maguire*) ["[a] complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties under a written instrument and requests that these rights and duties be adjudged by the court"].)

25

Once the court determines an "actual controversy" exists, the court has discretion under Code of Civil Procedure section 1061 to refuse to make a declaration of rights and duties "including a determination of any question of construction or validity arising under a written instrument or contract, 'where its declaration or determination is not necessary or proper at the time under all the circumstances.' " (*Maguire*, *supra*, 23 Cal.2d at pp. 728, 730.) The decision to refuse to entertain a complaint for declaratory relief is reviewed on appeal for abuse of discretion. (*Orloff v. Metropolitan Trust Co.* (1941) 17 Cal.2d 484, 485.)

The court here determined Graham failed to present a claim supporting a justiciable controversy. We agree.

A

*Graham Has No Standing for Declaratory Relief*
*Based on the National Mortgage Settlement*

Graham is not entitled to declaratory relief regarding the National Mortgage Settlement because he has no standing to enforce the consent judgment. "[I]ndividual borrowers are merely incidental beneficiaries of the National Mortgage Settlement, and so have no right to bring third-party suits to enforce the Consent Judgment." (*Rehbein v. CitiMortgage, Inc.* (E.D. Va. 2013) 937 F.Supp.2d 753, 762; *Jurewitz v. Bank of Am., N.A.* (S.D. Cal. 2013) 938 F.Supp.2d 994, 998 [Consent Judgment contains enforcement provisions, which do not reference the possibility of enforcement by individual borrowers].)

26

B

*Graham Does Not Sufficiently Allege the Loan Was Unconscionable*

Graham is not entitled to a declaration the loan agreement is unconscionable. "Unconscionability is a question of law." (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1539 (*Jones*).)  Generally, unconscionability is " 'recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " (*Shadoan v. World Sav. & Loan Ass'n.* (1990) 219 Cal.App.3d 97, 102 (*Shadoan*).)

"The doctrine includes both procedural and substantive elements.  [Citation.]  The procedural element requires oppression or surprise.  [Citation.]  Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.  [Citation.] The substantive element concerns whether a contractual provision reallocates risks in an objectively unreasonable or unexpected manner.  [Citation.]  To be substantively unconscionable, a contractual provision must shock the conscience." (*Jones*, *supra*, 112 Cal.App.4th at pp. 1539-1540.)

Both elements of procedural and substantive unconscionability must be present, although they need not be present to the same degree.  " 'Essentially a sliding scale is invoked . . . '[citations] . . . the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83,114.)

27

In this case, Graham fails to allege sufficient facts to show either procedural or substantive unconscionability. Graham makes general allegations defendants "actions during the transaction were procedurally unconscionable when they took advantage of the plaintiff's lack of sophistication when they: [¶] a. insisted on an interest-only loan; [¶] b. provided only one loan option, and no other choices for financing their home; [¶] c. provided fixed and immovable deadlines by which plaintiff was required to sign loan documents (so that defendants could process and transfer the loan into securitized trusts by its 'closing date'); [¶] d. failed to assist herein in understanding the loan documents; [¶] e. disallowed plaintiff adequate time to review loan documents or to procure aid in reviewing; [¶] f. demanded he sign the loan documents the same day of the deadline . . . ; [¶] g. falsely assured plaintiff with the representations, in justifying haste; [¶] h. failed to divulge the unstable, unsustainable nature of the loans; [¶] i. and failed in all respects to all representations as fully herein set forth."

These allegations do not sufficiently allege lack of choice, lack of negotiation or surprise regarding the terms of the loan to demonstrate procedural unconscionability. Graham does not allege he did not have the option to seek another lender or to simply choose not to enter the market place at the time. (*Shadoan*, *supra*, 219 Cal.App.3d at p. 103 [plaintiffs alleged no facts from which to conclude plaintiffs had no bargaining power because they "alleged no facts indicating that they were unable to receive more

28

favorable terms from another lender, or from [the bank] by paying a different interest rate, or by accepting a different type of loan, or one with a different term"].)[10]

Even if we were to assume Graham sufficiently alleged procedural unconscionability, he does not allege substantive unconscionability. Graham did not attach the loan agreement to his complaint and he does not allege specific terms he alleges are substantively unconscionable. The only substantive term Graham refers to on appeal is that defendants "insisted on an interest-only loan."

We cannot conclude an allegation of the existence of an interest only loan or an adjustable rate mortgage, without more, shocks the conscience or is so oppressive or favorable to defendants as to render the loan unconscionable. (*Shadoan*, *supra*, 219 Cal.App.3d at pp. 103-104 [loan with unilateral call and prepayment penalty provisions

---

[10] A number of California District Court's, applying California law, have held plaintiffs are unable to show procedural unconscionability in similar loan transactions where the complaint "lacks facts establishing how the agreement was presented to the plaintiff, facts establishing relative bargaining power, or facts establishing a lack of negotiation." (*Riggins v. Bank of Am., N.A.* (C.D. Cal. Jan. 24, 2013) 2013 U.S. Dist. LEXIS 11282, *31 citing *Ghuman v. Wells Fargo Bank, N.A.* (E.D. Cal. 2012) 2012 U.S. Dist. LEXIS 103248, *20 [complaint did not demonstrate agreement was oppressive because it failed to allege facts establishing how plaintiff was presented with loan agreement or facts establishing relative bargaining power]; *Chang Bee Yang v. Sun Trust Mortg., Inc.,* (E.D. Cal. 2011) 2011 U.S. Dist. LEXIS 147656, *28 [plaintiffs failed to show agreement was oppressive because there were presumably other lenders who would have entered into a loan if they were unable to negotiated over terms and conditions]; *Park v. Wachovia Mortg. FSB* (S.D. Cal. 2011) 2011 U.S. Dist. LEXIS 2956, *33 ["[c]omplaint fail[ed] to identify facts that there was a lack of negotiation and meaningful choice in obtaining the loan agreement and trust deed to support procedural unconscionability."]; *Legrama v. Fremont Inv. & Loan* (N.D. Cal. 2010) 2010 U.S. Dist. LEXIS 126784, *49-*50 [no procedural unconscionability where "[p]laintiffs state in their [c]omplaint that [d]efendants acted from an unfair bargaining position, [but] they offer no facts in support of this contention"].)

29

not unconscionable]; *Jones*, *supra*, 112 Cal.App.4th at p. 1540 [interest provisions in note and forbearance agreement do not shock the conscience].)

Various federal financial regulatory agencies and other entities issued documents and statements in 2006 and 2007 (after Graham obtained his loan) providing risk management and consumer protection guidelines for the use of nontraditional and subprime loans such as interest only loans or adjustable rate mortgages, which California adopted. (Greenwald, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2013) ¶ 6:99, p. 6-20.5 citing Stats. 2007, ch. 301, § 1, p. 2437 (legislative findings).) However, these remain recognized loan products and are not necessarily improper or predatory loans. (Cal. Code Regs., tit. 10, § 1436; 72 Fed.Reg. 37569, 37573 ["[s]ubprime lending is not synonymous with predatory lending, and loans with the features described . . . are not necessarily predatory in nature"].)

Based upon the facts alleged, we conclude a declaration regarding unconscionability is not proper or necessary under the circumstances. (Code Civ. Proc., § 1061.)

V

*The Court Did Not Abuse Its Discretion in Denying Leave to Amend*

"If we see a reasonable possibility that the plaintiff could cure the defect by amendment, then we conclude that the trial court abused its discretion in denying leave to amend. If we determine otherwise, then we conclude it did not." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320.) " 'The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*Maxton v. Western States Metals*

30

(2012) 203 Cal.App.4th 81, 95.)  To satisfy this burden, " 'a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading" ' " by clearly stating not only the legal basis for the amendment, but also the factual allegations to sufficiently state a cause of action.  (*Ibid*.)

Graham has had three opportunities to plead his claims for fraud, violations of the UCL and declaratory relief.  While Graham contends he should be given leave to amend, he does not meet his burden of demonstrating how he can amend his complaint or how it would change the legal effect.  " 'The assertion of an abstract right to amend does not satisfy this burden.' "  (*Maxton*, *supra*, 203 Cal.App.4th at p. 95.)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.


MCCONNELL, P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.

31