Filed 8/17/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DEBRA TURNER, | D076318, D076337 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. Nos. 37-2017-00009873-PR-TR-CTL; 37-2018-00038613-CU-MC-CTL) |
| LAURIE ANNE VICTORIA et al., | |
| Defendants and Respondents. | |

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, Julia C. Kelety and Kenneth J. Medel, Judges. Modified in part, affirmed in part, vacated in part, and remanded with direction.

Cooley, Steven M. Strauss and Erin C. Trenda for Plaintiff and Appellant.

Gibson Dunn & Crutcher, Scott Alan Edelman, Alexander Kosta Mircheff, Megan Marie Cooney, and Jillian Nicole London for Defendant and Respondent Laurie Anne Victoria.

Henderson, Caverly, Pum & Trytten, Kristen E. Caverly and Lisa B. Roper for Defendant and Respondent Joseph Gronotte.

Procopio, Cory, Hargreaves & Savitch, Richard A. Heller, J. Christopher Jaczko, and Sean Michael for Defendant and Respondent Gregory Rogers.

Seltzer Caplan McMahon Vitek, Reginal Vitek and Scott Walter Perlin for Defendant and Respondent Anthony Cortes.

Brownlie Hansen, Robert W. Brownlie; DLA Piper, S. Andrew Pharies for Defendant and Respondent The Conrad Prebys Foundation.

Xavier Becerra, Attorney General, Tania M. Ibanez, Assistant Attorney General, Caroline Hughes and James M. Toma, Deputy Attorneys General for Amicus Curiae on behalf of the State of California.

## I

## INTRODUCTION

In this appeal, we consider whether a director of a nonprofit public benefit corporation who brings an action on behalf of the nonprofit public benefit corporation can lose standing to pursue its claims if the director is not reelected during the litigation.

Debra Turner, formerly a director and president of the Conrad Prebys Foundation (Foundation), appeals judgments of dismissal in favor of the Foundation and its directors, following orders sustaining demurrers to her probate and civil actions.[1] In those actions, Turner alleged the other Foundation directors breached their fiduciary duties in preapproving a settlement range for Laurie Anne Victoria, who served both as a Foundation

---

[1] Directors Joseph Gronotte, Anthony Cortes, and Gregory Rogers were dismissed from the probate action, but are parties with respect to the civil action. Cortes and Rogers joined the briefs submitted by the Foundation and Laurie Anne Victoria as well as the answer to the amicus brief submitted by the Attorney General. Gronotte joined Victoria's brief and the answer to the Attorney General's brief.

2

director and as the trustee of the Conrad Prebys Trust (Trust), to negotiate a settlement of a trust challenge by a disinherited heir. Turner also challenged Victoria's actions as trustee. Several months after commencing her action, Turner's term as a Foundation director and officer expired when she was not reelected to her positions during the annual election process. The civil and probate courts determined that Turner lost standing to maintain her causes of action.

Turner contends she has standing under Corporations Code[2] sections 5142, 5233, 5223, and/or 5710 to pursue the claims on behalf of the Foundation because she was a director and officer when she commenced the action and the statutory scheme for nonprofit benefit corporations does not require continuous directorship status to maintain standing since the claims belong to the corporation. Neither the text nor the legislative history of these statutes suggests an intention to depart from the ordinary principles requiring a plaintiff to maintain standing throughout litigation. We conclude the statutory scheme and public policy considerations require a continuous relationship with the public benefit corporation that is special and definite to ensure the litigation is pursued in good faith for the benefit of the corporation. If a plaintiff does not maintain such a relationship, the statutory scheme provides the nonprofit public benefit corporation with protection through the Attorney General, who may pursue any necessary action either directly or by granting an individual relator status.

Because Turner lost standing to pursue her causes of action, we affirm the judgments of dismissal as to Turner acting in her capacity as a former

[2]    Further statutory references are to the Corporations Code unless otherwise designated.

3

director and officer.  We remand, however, with directions for the civil and probate courts to grant 60 days leave to amend, limited to the issue of whether a proper plaintiff may be substituted to pursue the existing claims. The Attorney General may consider during that 60-day period whether granting relator status to Turner, or another individual, for these claims is appropriate.

## II

## BACKGROUND[3]

A. *Factual Background*

   1. *Establishment of the Trust and Foundation*

Conrad Prebys was known in San Diego for his successful construction and real estate ventures and for his generous philanthropy.  He donated hundreds of millions of dollars to local medical, educational, and arts institutions during his lifetime.

Prebys established the Trust in 1982 and created the Foundation in 2005 as a nonprofit public benefit corporation.  The Trust provided that, after making specified distributions to identified beneficiaries, the trustee must distribute the remainder of the estate to the Foundation so it could continue to make grants and distributions for charitable purposes after Prebys's death. The Foundation's articles of incorporation provided that the "property of this corporation is irrevocably dedicated to charitable purposes and no part of the

---

[3]    We draw the factual background from the operative complaint in the civil action  and the operative pleading in the probate action.  In reviewing a judgment of dismissal on demurrer, "we accept the truth of material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law.  We may also consider matters subject to judicial notice."  (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 346.)

4

net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person."

The operative bylaws of the Foundation state the Foundation's "assets and income shall be held in charitable trust, to be administered and distributed as provided herein for the qualified charitable, religious, scientific, literary or educational purposes of the supported organization."

2. *Turner's Relationship to Prebys and the Foundation*

Turner, who lived with Prebys over the last 16 years of his life and describes herself as his life partner, was a beneficiary of a gift trust and sat on a two-member real estate committee for the Trust. She was also a member of the Foundation's board of directors and served as an officer.

3. *Prebys Creates and Withdraws His Son's Gift Trust*

Prebys created a gift trust for his son in 2007. He allegedly had a falling out with the son in 2014. Prebys amended the gift trust in July 2014 to reduce the son's gift to $20 million, to be held in trust during the son's lifetime with taxes paid from the bequest. After another alleged falling out, Prebys revoked the son's gift trust completely in October 2014.

4. *Prebys Amends the Trust*

Prebys underwent treatment for cancer from 2014 through 2015, but allegedly remained in good mental health. He named Victoria chief executive officer of his company in 2015 and recommended another individual employed by his company to serve on the Foundation's board.

Prebys amended and restated the Trust in February 2016, naming Victoria as his successor trustee for the Trust as well as for the gift trusts. The restated Trust defined amounts to pour over into previously identified gift trusts. The remainder of the Trust estate was to be held as a separate trust pursuant to the terms of the Foundation and applied by the Foundation

5

"to support performing arts, medical research and treatment, visual arts, and other charitable purposes consistent with the trustor's history of philanthropy during his lifetime, with an emphasis on such philanthropy in the San Diego area." Prebys amended several of the gift trusts and instructed the trustee to pay any estate taxes on the gifts so that all gifts were tax-free.

The 2016 restated Trust noted the son's gift trust was "previously revoked in its entirety." It stated Prebys expressly made no provision for Prebys's son and no distribution would be made to the son's formerly designated gift trust.

5. *Events After Prebys's Death*

When Prebys died in July 2016, Victoria assumed the duties as trustee of the Trust and engaged the attorney who prepared the Trust amendments to represent the Trust. Days after Prebys died, Victoria allegedly began discussing with the attorney how to address a potential challenge to the 2014 and 2016 documents revoking the son's gift trust. They discussed a dollar amount for a potential settlement shortly after the funeral in August 2016.

After Prebys's funeral, the son told Turner he did not want his father's money, but asked if he had been written out of the will. Turner confirmed the son would not receive anything from the estate unless Prebys had changed his mind after the February 2016 amendments.

Thereafter, the son hired an attorney to challenge the trust amendments that disinherited the son. The son alleged the amendments were invalid because Prebys lacked mental competence due to his illness and Turner unduly influenced Prebys.

6

### 6. *Foundation Board Meetings in 2016*

In September 2016, at the first board meeting after Prebys's death, the board elected Turner as president of the Foundation and chairperson of the board. The Trust's attorney attended the meeting and discussed the details of establishing the Foundation since he had prepared the Trust documentation.[4] He discussed the issue of a possible trust contest by the son, explaining Prebys reduced the son's gift in 2014 and later revoked it entirely. Victoria, as trustee, wanted to settle the son's claim. The board discussed a dollar amount Victoria could use to negotiate with the son's attorney.

Turner told the other board members that Prebys revoked the son's gift for a reason and documented his intention not to provide a gift to his son in the Trust as well as in the gift trusts. Turner expressed her view that the claims of lack of capacity and undue influence were false and could not be supported by evidence. She alleged the attorney and the other board members did not think the son could establish that Prebys was not competent in 2014 to make his own decisions.

The attorney cautioned the board members that the son could " 'get it all,' " which could deprive the Foundation of its funding. He also warned that if the son could establish incompetence, Prebys's decisions "could be undone like 'peeling the layers of an onion.' "

The other board members expressed a desire to settle rather than fight a lawsuit by the son, which could involve a lengthy trial. Turner commented that Prebys settled "small business-related suits" involving slip-and-fall

---

4    The Foundation did not have its own counsel because it was not yet funded.

allegations or water damages, but she said he would never settle personal matters. No settlement amounts were discussed and the issue was tabled without a vote.

After the meeting, Turner told the trust attorney it seemed like a conflict of interests to have Victoria and the other person who was employed by Prebys's company on the board.

At a November 2016 board meeting, Turner asked the other board members to sign an acknowledgement affirming they received, read, understood, and agreed to a copy of a conflict of interest policy and IRS regulations regarding self-dealing. Turner never received signed acknowledgements from the other directors. Turner alleges the other directors became dismissive of Prebys's wishes and said they were going to do things their way now that Prebys was dead.

The son's attorney sent a letter to the trustee's attorney in December 2016 alleging that Prebys lacked capacity to revoke the son's gift trust and that Prebys was the victim of undue influence by Turner. The son alleged Turner limited the son's contact with Prebys and controlled their communication from 2013 to 2016, particularly after Prebys was diagnosed with cancer in 2014. He further alleged Prebys became "increasingly confused" in phone calls with the son between 2014 and 2016. Turner attributed any confusion to Prebys's chemotherapy treatment. The son offered to waive and release any claims in exchange for payment of the gift trust Prebys initially established for him.

Victoria asked Turner to set up a board meeting to discuss the letter from the son's attorney. Victoria wanted to settle the son's claim to avoid the ordeal of depositions and a trial. Turner said the claims were meritless and Prebys would not want to settle.

8

The board met in December 2016 to discuss a potential settlement with the son. The Trust's attorney attended the meeting and read portions of the letter from the son's attorney to the board. The Trust's attorney encouraged the board to preapprove a settlement amount, stating it could cost over $1 million in legal fees to defend a trust contest by the son. He commented that Prebys was capable of making his own decisions in 2014, the year he disinherited the son. However, the Trust's attorney expressed some concern about the ability to prove Prebys's competence in 2016. He again warned the board that, " 'like an onion the layers of the Trust could be peeled back and reversed by the [c]ourt.' " For example, the 2016 changes made the gifts tax free and a reversal of those changes could result in the gifts being taxed. One board member commented that they did not want to " 'open that can of worms, as some people might think some of us shouldn't even be on the [b]oard.' "

According to Turner, the board members did not investigate the merits of the son's claims and there was no discussion of how the son's claims personally and financially impacted the board members or the Foundation's bylaws regarding conflict of interest.

Turner said three of the board members had conflicts and should not vote. The Trust's attorney allegedly stated, " '[T]his is where you decide that there isn't a conflict.' " The other board members did not respond to the comment and the attorney called for a vote regarding how much to offer the son for settlement.

Victoria and the other board members suggested approving various settlement amounts. In a vote of four to one, the board ultimately approved

9

the trustee to offer as much as $12 million to settle the son's claims, with the Trust paying any estate tax.[5]

7.  *The Trust's Settlement with the Son*

Thereafter, the Trust's attorney negotiated a settlement with the son for $9 million, tax-free, which was paid in January 2017.  With taxes, the value of the settlement was approximately $15 million.  Turner alleges the settlement diverted $15 million away from the Foundation's charitable purposes.

8.  *Turner's Actions to Challenge the Settlement Approval*

In March 2017, Turner delivered a demand letter and a draft petition challenging the board members' agreement to settle with the son as improperly diverting Foundation funds while obtaining personal benefit from the settlement of the son's claims.  Turner stated she intended to discuss the matter with the Attorney General to take action against the board for improperly diverting charitable funds.

Turner alleged the board took no steps to consider the demand or to address the harm to the Foundation.  The other board members retained defense counsel and inquired about insurance and indemnification from the Foundation.  According to Turner, the other board members were dismissive of the demand letter, calling it a " 'distraction.' "  The other directors would not speak to her and the meeting was quickly adjourned.

Turner alleged the other directors displayed hostility toward her and she became concerned the other directors would try to remove her from the Foundation.  When she raised this concern, some directors assured her they

---

[5]     Turner alleges Victoria sought preapproval from the board to avoid potential liability as trustee of the Trust if she settled with the son within the authorized range.

10

would not vote to remove her at the next board meeting. One board member said, " 'we are not going to remove you . . . now.' "

A couple of months later, in May 2017, Turner filed her probate petition. When she was absent from a board meeting a few days thereafter, the other board members retained counsel to represent the Foundation and the Trust.

9. *Board Election*

At a board meeting on November 7, 2017, the other four directors nominated one another for reelection as directors. The board voted to renew their terms, with Turner casting the sole dissenting vote. The board then elected officers, with the other directors nominating and electing one another for positions. None of the other board members nominated Turner for reelection as a director or as an officer. As a result of the election, Turner's term expired and she was asked to leave the meeting. She alleges the other directors appeared gleeful about the election results.

Turner alleged she did not know she could nominate herself. Although the minutes from the meeting reflect that the Foundation's executive director suggested a process of self-nomination, Turner understood the proposal only pertained to the election of officers. She claimed it would have been futile for her to nominate herself for reelection as a director or an officer.

Thereafter, Turner sent a letter to the board of directors formally nominating herself for reelection as a director for the Foundation. She received no response. She further alleged her board seat was not filled or eliminated and remains vacant.

Turner alleged the defendant directors became "openly hostile" toward her after she "refused to approve the diversion of Trust funds to a non-charitable purpose." She alleged the hostility increased after she brought

11

this action and culminated when they "refused to nominate and reelect [Turner] as a director or officer." She alleged on information and belief that the director defendants were "improperly motivated by their desire to cut off this litigation." Turner claimed the other directors retaliated against her after she brought the action by refusing to reelect her as a director and officer.

B. *Procedural History*

1. *Probate Action*

Turner's probate petition alleged "causes of action" styled as: (1) breach of fiduciary duty of care, (2) breach of fiduciary duty of loyalty and self-dealing, (3) removal of directors, (4) breach of trustee's fiduciary duties, (5) demand for accounting, (6) surcharge, (7) denial of trustee fees, and (8) double damages. Turner alleged the first three causes of action on behalf of the Foundation against the other directors. Turner alleged the remaining causes of action derivatively on behalf of the Foundation against Victoria in her role as trustee of the Trust.

Turner brought the action in her role as a director and president of the Foundation pursuant to sections 5142, subdivision (a)(2) and (3) and 5233, subdivision (c)(2) and (3), and derivatively on behalf of the Foundation as a member under section 5710. She also alleged she was a beneficiary of one of the gift trusts.

Turner amended the probate petition in July 2017 to name the Attorney General as a nominal respondent. The Attorney General entered a general appearance acknowledging the joinder in the action, but indicated he would not participate in conferences or trial unless ordered by the court.

After the November 7, 2017 election, Victoria obtained a stay of discovery pending resolution of the defendants' demurrers, including the

12

issue of whether Turner had standing since she was no longer a director, officer, or member of the Foundation.

Turner filed a second amended petition, again derivatively on behalf of the Foundation and in her role as director and president of the Foundation, alleging she continued to have standing to assert the causes of action on behalf of the Foundation because she had standing when she filed the petition, notwithstanding the results of the November 2017 election. She alleged the efforts to remove her from the Foundation were in retaliation for her refusal to approve the diversion of Trust funds to a noncharitable purpose and were motivated by the desire to cut off litigation.[6]

The defendant directors and the Foundation again filed demurrers contending, in part, that Turner lacked standing to bring any of the claims. Turner opposed the motions asserting, as she does on appeal, that she has standing because she was a member, director, and officer at the time she filed the action and the other directors should not be able to cut off litigation by refusing to reelect her.

The probate court determined Turner's causes of action against her former fellow board members were "ill-suited to the probate arena" and were "best decided in a civil suit pertaining to the inner-workings of the Foundation's corporate governance." On its own motion, the probate court ordered the first through fourth causes of action severed pursuant to Probate Code section 801 and transferred for decision in a separate civil proceeding

---

[6] Although Turner again alleged she was a beneficiary of a gift trust from Prebys, she did not assert her causes of action on her own behalf as a trust beneficiary. She alleged she sought only remedies for the benefit of the Foundation.

13

by way of a new civil complaint, which would relate back to the date of the original petition.

The court determined the fifth through ninth causes of action against the trustee were based on Turner's standing to act derivatively on behalf of the Foundation under section 5710, subdivision (b). The probate court determined the civil court should decide whether the board members' actions were proper and in keeping with their fiduciary duties to the Foundation since the facts upon which Turner relied to pursue a derivative action on behalf of the Foundation were "inextricably intertwined with the propriety of the [b]oard's actions, both in voting to 'pre-approve' the settlement" and the later " 'effort to remove' " Turner from the Foundation. Thus, the probate court stayed the demurrers and corresponding motions to strike as to the remaining causes of action pending a decision regarding Turner's standing to bring a derivative action on behalf of the Foundation in the civil matter. Turner, thereafter, dismissed the directors other than Victoria from the probate matter.

2. *Civil Action and Judgment*

Turner filed a civil complaint realleging the same first four causes of action from the probate petition. She included allegations that she held a fiduciary role on the Trust's two-member real estate committee, which had authority to decide how its holdings are handled, which she alleged impacts the Foundation's funding. She named the Attorney General as a nominal defendant in this action as well. The Attorney General made a general appearance, but indicated the intention not to participate unless ordered by the court. The court sustained the defendants' demurrers to the complaint

concluding Turner had not alleged facts sufficient to establish she maintained standing. The civil court, however, granted leave to amend.

In an amended complaint, Turner realleged the causes of action for breach of charitable trust and breach of fiduciary duties of care against the other four board members in her capacity as a director or officer of the Foundation pursuant to sections 5142, subdivision (a)(2) and (3), and 5233, subdivision (c)(2) and (3) and derivatively on behalf of the Foundation under sections 5142, subdivision (a)(1) and 5710. She alleged the third cause of action against Victoria and another director for breach of duty based on allegations of self-dealing and violating the duty of loyalty. In the fourth cause of action, she sought removal of the other four directors pursuant to sections 5223 and 5710 based on allegations the directors engaged in "dishonest acts and gross abuse of authority or discretion in approving the improper diversion of charitable funds to a noncharitable purpose." Turner prayed for removal of the directors and asked the court to hold them jointly and severally liable to the Foundation for damages. She also sought her attorney fees and costs.

The court sustained the defendants' demurrers to the operative amended complaint without leave to amend concluding Turner, as a former director and member, no longer had standing to bring derivative claims on behalf of the Foundation and, likewise, did not have standing under the director statutes. The court entered a judgment of dismissal of the civil complaint.

### 3. *Probate Judgment*

The probate court and counsel discussed what to do with the remaining causes of action pending in the probate court after the civil court's ruling, which Turner intended to appeal. The court concluded Turner had not

15

established the standing she needed to pursue the fifth through ninth causes of action in the probate petition. The court, therefore, sustained the pending demurrers to the remaining causes of action and entered a judgment of dismissal on the petition.

III

DISCUSSION

Turner contends the civil and probate courts erred in sustaining the defendants' demurrers to her claims based on lack of standing because she had standing at the time she filed her action and she did not lose standing when she was not reelected as a board member and officer of the Foundation. We begin with an overview of the general principles and proceed to analyze the statutes and authorities upon which she relies before applying them to the facts alleged in this case.

A. *Standard of Review and General Standing Principles*

In reviewing orders sustaining demurrers without leave to amend, we independently examine the operative complaint "to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162 (*Novartis*).) We " 'treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation reading it as a whole and its parts in their context.' " (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1034 quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment. The plaintiff

16

bears the burden of proving an amendment could cure the defect." (*Novartis*, at p. 162.)

" ' "The question of standing to sue is one of the right to relief and goes to the existence of a cause of action against the defendant." ' " (*Pillsbury v. Karmgard* (1994) 22 Cal.App.4th 743, 758.) "At its core, standing concerns a specific party's interest in the outcome of a lawsuit." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247 (*Weatherford*); Code Civ. Proc., § 367 ["every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute"].) " 'The prerequisites for standing to assert statutorily-based causes of action are determined from the statutory language, as well as the underlying legislative intent and the purpose of the statute.' " (*Dagher v. Ford Motor Co.* (2015) 238 Cal.App.4th 905, 916.) We independently review whether the statutory criteria have been met on undisputed facts. (*Ibid.*)

"For a lawsuit properly to be allowed to continue, standing must exist at all times until judgment is entered and not just on the date the complaint is filed. '[C]ontentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding.' " (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 232–233.) "A plaintiff may lose standing even where an actual controversy originally existed 'but, by the passage of time or a change in circumstances, ceased to exist.' " (*Wolf v. CDS Devco* (2010) 185 Cal.App.4th 903, 916–917 (*Wolf*).)

B. *Analysis*

Turner alleges she has standing to maintain her causes of action "both directly under the statutes that permit a director or officer to file an action against a director for misconduct under the California laws governing nonprofit public benefit corporations (§§ 5142, subd. (a)(2) and (3); 5233,

17

subd. (c)(2) and (3)), and derivatively under the law permitting a member to file an action on behalf of a non-profit public benefit corporation. (§§ 5142, subd. (a)(1); 5710.)" Turner also seeks removal of the defendants as board members pursuant to sections 5223 and 5710.

To consider Turner's claim that these statutes require standing at the time an action is commenced rather than continuous standing, "we must begin by considering the statute's language and structure, bearing in mind that our fundamental task in statutory interpretation is to ascertain and effectuate the law's intended purpose. [Citation.] We examine the ordinary meaning of the statutory language, the text of related provisions, and the overarching structure of the statutory scheme." (*Weatherford*, *supra*, 2 Cal.5th at p. 1246.)

"If, however, the statutory language is ambiguous, 'we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.' . . . Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1233.)

1. *Pertinent Statutes*

Section 5142, subdivision (a) provides a means by which a nonprofit public benefit corporation may obtain relief for a breach of a charitable trust stating, "any of the following may bring an action to enjoin, correct, obtain damages for or to otherwise remedy a breach of a charitable trust: [¶] (1) The corporation, or a member in the name of the corporation pursuant to [s]ection 5710. [¶] (2) An officer of the corporation. [¶] (3) A director of the corporation. [¶] (4) A person with a reversionary, contractual, or property interest in the assets subject to such charitable trust. [¶] (5) The Attorney

18

General, or any person granted relator status by the Attorney General."  For any action "brought by the persons specified in paragraphs (1) through (4)," the Attorney General shall be given notice and "may intervene."  (§ 5142, subd. (a).)

Section 5233 addresses self-dealing transactions, which it defines as "a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest," subject to certain exceptions. (§ 5233, subd. (a).)  To recover remedies for a self-dealing transaction on behalf of the corporation, "the Attorney General or, if the Attorney General is joined as an indispensable party, any of the following may bring an action [¶]  (1) The corporation, or a member asserting the right in the name of the corporation pursuant to [s]ection 5710.  [¶]  (2) A director of the corporation. [¶]  (3) An officer of the corporation.  [¶]  (4) Any person granted relator status by the Attorney General."  (§ 5233, subd. (c).)

Section 5223, subdivision (a) provides that a superior court "may, at the suit of a director . . . remove from office any director in case of fraudulent or dishonest acts or gross abuse of authority or discretion with reference to the corporation or breach of any duty . . . , and may bar from reelection any director so removed for a period prescribed by the court.  The corporation shall be made a party to such action."  Subdivision (b) states, "The Attorney General may bring an action under subdivision (a), may intervene in such an action brought by any other party and shall be given notice of any such action brought by any other party."

Finally, section 5710 provides for a member derivative action stating, in pertinent part, "No action may be instituted or maintained in the right of any corporation by any member of such corporation unless both of the following conditions exist:  [¶]  (1) The plaintiff alleges in the complaint that

19

plaintiff was a member at the time of the transaction or any part thereof which plaintiff complains; and  [¶]  (2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and alleges further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file."  (§ 5710, subd. (b).)

Turner contends the language in sections 5141 and 5233 specifying individuals who "*may bring an action*" (italics added) and the language in section 5223 stating a superior court may remove a director "*at the suit* of a director" (italics added) suggest standing is required only at the time an action is commenced and does not require continuous standing, as is required for derivative actions under section 5710, which uses the language "*instituted and maintained.*"  (Italics added.)  We are not persuaded.

The plain language of these statutes "is inconclusive" when considered alone and does not help us determine whether an individual who was qualified to commence an action must continue to have standing throughout the litigation.  (*Summers v. Colette* (2019) 34 Cal.App.5th 361, 368.)  Therefore, we look to the legislative history.

2. *Legislative History*

These statutes were enacted in 1978 as part of a comprehensive revision of the law governing nonprofit corporations to modernize and set forth in one division of the Corporations Code the law applicable to nonprofit corporations.  "The project was undertaken to modernize the Nonprofit Corporation Law and to facilitate the operation of nonprofit corporations while maintaining and expanding upon this state's traditional protection of

20

the rights of members, creditors and the public." (Rep. of the Assem. Select Com. on Revision of the Nonprofit Corp. Code, 5 Assem. J. (1979–1980 Reg. Sess.) Aug. 27, 1979, p. 9002.) The Special Committee on the Revision of the Nonprofit Corporation Law, appointed by the Business Law Section of the State Bar, included "attorneys who participated in drafting the GCL and attorneys who represented a wide variety of nonprofit entities." Additionally, representatives from the Secretary of State's office, the Department of Corporations, and the Charitable Trust Division of the Attorney General's office "provided advice and liaison to the Committee." (*Id.* at p. 9003.) The effective date of the legislation was postponed until January 1, 1980 to allow comment and suggestions from entities affected by the new law. The Legislature enacted primarily "cleanup" amendments to the statutory scheme in 1979. (Rep. of the Assem. Select Com. on Revision of the Nonprofit Corp. Code, 5 Assem. J. (1979–1980 Reg. Sess.) Aug. 27, 1979, pp. 9002–9003; 4 Sen.J. (1979–1980 Reg. Sess.) pp. 7005–7006.); Stats. 1978, ch. 567, § 5, pp. 1750, 1755, 1762, 1764–1766, 1787; Stats. 1979, ch. 724, pp. 2226, 2235, 2242–2245; see also Assem. Select Com. on Revision of the Nonprofit Corp. Code, Summary of Assem. Bill Nos. 2180 and 2181 (1977–1978 Reg. Sess.) July 27, 1978, p. 1.)[7]

---

[7] The Assembly Select Committee on Revision of the Nonprofit Corporations Code prepared a report "to aid the Legislature in voting on AB 495 and AB 1632 and the courts and members of the bar of this state in comprehending the new Nonprofit Corporation Law ("New Law") enacted in 1978 by AB 2180 and amended in 1979 by AB 495 and AB 1632." This report was printed in the Assembly Journal by unanimous consent and in the Senate Journal by motion. (5 Assem. J. (1979–1980 Reg. Sess.) p. 9002; 4 Sen. J. (1979–1980 Reg. Sess.) p. 7005.) We grant the Attorney General's request to take judicial notice of this report along with a cover letter from Speaker Pro Tempore of the California Assembly John Knox to Governor

The drafters explained that they followed the format and language of the general corporation law (GCL) and "employ[ed] the GCL language whenever the same substantive results are intended. The use of different language would needlessly invite erroneous speculation by lawyers or judges that the change in language has a substantive purpose. . . . Keeping the language the same also allows those using the New Law to benefit from judicial interpretations of the GCL." (Rep. of the Assem. Select Com. on Revision of the Nonprofit Corp. Code, 5 Assem. J. (1979–1980 Reg. Sess.) Aug. 27, 1979, p. 9004; 4 Sen.J. (1979–1980 Reg. Sess.) p. 7007; see also Assem. Select Com. on Revision of the Nonprofit Corp. Code, Summary of Assem. Bill Nos. 2180 and 2181 (1977–1978 Reg. Sess.) July 27, 1978, p. 2.)

In earlier committee comments, the drafters acknowledged the natural inclination to " 'improve' upon the work of others" particularly when one sees "blemishes or ambiguities that were invisible to the original draftsmen." However, for the most part, they "adhered steadfastly" to the intention to follow the form of the GCL. (Assem. Com. on Judiciary, Bill Analysis Work Sheet of Assem. Bill No. 2180 with Comments on Proposed Nonprofit and Nonstock Corp Law by Assem. Select Com. on Revision of the Nonprofit Corp. Code, p. 3.)

Accordingly, section 5223 is similar to the language of section 304 involving an action to remove a director "at the suit of" certain shareholders (those "holding at least 10 percent of the number of outstanding shares of any class") for "fraudulent or dishonest acts or gross abuse of authority or discretion with reference to the corporation."

---

Edmund G. Brown, Jr. dated August 29, 1978 enclosing the July 27, 1978 report for purposes of signing.

Section 5710, subdivision (b), follows the language of section 800 which states, "[n]o action may be instituted or maintained" in the right of the corporation by a member "unless both of the following conditions exist:" (1) the plaintiff was a shareholder "at the time of the transaction or any part thereof of which plaintiff complains" and (2) the plaintiff alleges "with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and alleges further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file."

Sections 5142 and 5233 were new provisions that did not have a direct correlation to the GCL. (Marsh, Finkle and Bishop, Marsh's Cal. Corp. Law, (Aspen Pub. 2021), App. B Committee Reports, B.1.A., Assem. Select Com., Rep. on Revision of the Nonprofit Corp. Code, Aug. 27, 1979, Cross-reference Tables, Intro and Chart for Part II.) However, section 5142 was derived from former Corporations Code section 9505 (as added Stats 1947 ch. 1038) and former Civil Code section 605c (as added Stats 1931, ch. 871, § 1.) (Derivation Notes, Deering's Ann. Corp. Code (2021 ed.) foll. § 5142.) These former statutes provided that the Attorney General, who was charged with supervision of nonprofit corporations holding property subject to any public or charitable trust, "shall institute" in the name of the state "proceedings necessary to correct" noncompliance or departure from the terms of the trust or the general purposes for which it was formed. (Stats 1947, ch. 1038, pp. 2414–2415; Stats. 1931, ch. 871, p. 1852.)

Section 5142 follows the general formulation of the former statutes from which it was derived. However, it expands the statutory authority to

23

"bring an action to enjoin, correct, obtain damages for or to otherwise remedy a breach of a charitable trust" to include not only the Attorney General, but also specified corporate representatives.[8]

Section 5233 was the subject of much discussion and resulted from proposals by the State Bar Committee, including the Attorney General's representative, to define self-dealing transactions and to allow the corporation to validate some transactions that would otherwise qualify as self-dealing. This allowed nonprofit public benefit corporations "to take advantage of opportunities made available to them by their directors while at the same time protecting them from insider abuses." (Assem. Select Com. on Revision of the Nonprofit Corp. Code, Report on Revision of the Nonprofit Corp. Code 5 Assem. J. (1979–1980 Reg. Sess.) Aug. 27, 1979, pp. 9009–9010; 4 Sen.J. (1979–1980 Reg. Sess.) p. 7013.)[9] There is no indication, however, that the drafters' discussions involved the question of whether an individual

---

[8]     Section 5142 is in the section of the law dealing with the formation and corporate powers of public benefit corporations. (Assem. Select Com. on Revision of the Nonprofit Corp. Code, Report on Revision of the Nonprofit Corp. Code 5 Assem. J. (1979–1980 Reg. Sess.) Aug. 27, 1979, p. 9007; 4 Sen.J. (1979–1980 Reg. Sess.) p. 7011.)

[9]     Former section 5233, added by the 1978 legislation, was repealed and replaced in 1979 by Assembly Bill No. 495. The relevant portions of the statute involving who may bring an action for self-dealing are identical to the current statute. (See Stats. 1978, ch. 567, pp. 1764–1766, and Stats. 1979, ch. 724, §§ 25–26, pp. 2242–2243.) Section 5233 was later amended in 1980, in part, to shorten the period within which to commence an action for self-dealing from 10 years to 3 years after the transaction occurred, except for the Attorney General, who continued to have 10 years after the transaction occurred to commence an action. (3 Stats 1980 (1979–1980 Reg. Sess.), ch. 1155, § 4; Legis. Counsel's Dig., Assem. Bill No. 3343 (1979–1980 Reg. Sess), 4 Stats 1980, Summary Dig., p. 375; see also Deering's Ann. Corp. Code (2021 ed.) History & Notes foll. § 5233.)

who brings an action to correct or to remedy self-dealing transactions may continue an action if the individual loses status as a qualified individual under the statute.

Based on our examination of the legislative history, nothing suggests the Legislature intended to depart from the generally applicable standing principles for actions involving nonprofit public benefit corporations. Although courts may infer the Legislature intended a different meaning if materially different language is used in statutory provisions addressing the same or related subjects (see *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 463), we cannot draw such an inference here. The legislative history for this statutory scheme indicates only a clear intention to hew as closely to the law used for general corporations as possible–despite any ambiguities or inconsistencies in the language of the GCL statues–while providing for the unique circumstances of internal governance of nonprofit public benefit corporations.

3. *Judicial Interpretations*

We look, then, to judicial interpretations of similar provisions in GCL to interpret the statutes before us because there are few authorities directly addressing the provisions regarding nonprofit public benefit corporations. (Rep. of the Assem. Select Com. on Revision of the Nonprofit Corp. Code, 5 Assem. J. (1979–1980 Reg. Sess.) Aug. 27, 1979, p. 9004; 4 Sen.J. (1979–1980 Reg. Sess.) p. 7007; see also *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 716 ["When the Legislature has expressly declared its intent, we must accept the declaration."].)

We begin, however, with *Holt v. College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2d 750 (*Holt*) in which the Supreme Court concluded that minority directors or trustees of a charitable corporation could maintain

an action against majority trustees to enjoin a threatened breach of trust. (*Id.* at p. 755.) The Supreme Court stated that although the Attorney General had "primary responsibility for the enforcement of charitable trusts" under former section 9505, "the need for adequate enforcement [was] not wholly fulfilled by the authority given" to that office. (*Ibid.*)

The Supreme Court determined that "responsible individuals" could sue on behalf of the charitable corporation. (*Holt, supra,* 61 Cal.2d at p. 755.) " 'The charity's own representative has at least as much interest in preserving the charitable funds as does the Attorney General who represents the general public. The cotrustee is also in the best position to learn about breaches of trust and to bring the relevant facts to a court's attention.' [Citation.] Moreover, permitting suits by trustees does not usurp the responsibility of the Attorney General, since he would be a necessary party to such litigation and would represent the public interest." (*Id.* at p. 756.) In reaching this conclusion, the Supreme Court relied on the special interest the trustees had as fiduciaries to the charitable corporation commenting that the trustees "are the ones solely responsible for administering the trust assets" and "they are fiduciaries in performing their trust duties." (*Ibid.*) The court noted the majority view of other jurisdictions was that "a trustee or other person having a special interest" may enforce a charitable trust in addition to the Attorney General. But " 'the only person who can object to the disposition of the trust property is one having some definite interest in the property—he must be a trustee, or a *cestui*, or have some reversionary interest in the trust property.' " ( *Id.* at p. 753.)[10]

_____

[10] Turner and the Attorney General rely on the Supreme Court's comment in footnote 4 of *Holt* for the general proposition that differences in private and charitable corporations make consideration of interpretations of statutes

Relying on *Holt*, we concluded in *San Diego Etc. Boy Scouts of America v. City of Escondido* (1971) 14 Cal.App.3d 189, 195 (*Boy Scouts*), that youth organizations had standing to enforce the charitable trust on behalf of the youth beneficiaries when a property owner intended to use the property for a purpose other than that for which it was designated by the charitable trust. (*Id.* at pp. 191, 195–196.) We concluded that although former section 9505 placed the duty to supervise charitable trusts upon the Attorney General, "the right of the Attorney General to sue to enforce a charitable trust is not exclusive: other responsible individuals may be permitted to sue on behalf of the charity." (*Id.* at p. 195.)

Thereafter, as we have seen, after careful consideration and after receiving input from stakeholders, including a representative of the Attorney General, the Legislature enacted section 5142, codifying and defining the categories of individuals who have standing to seek a remedy for breach of a charitable trust on behalf of a nonprofit public benefit corporation in addition to the Attorney General: an officer of the corporation, a director of the corporation, the corporation or a member of the corporation (under § 5710), or

---

regarding general corporations "valueless." (*Holt*, *supra*, 61 Cal.2d at p. 762, fn. 4.) The Supreme Court did not go that far. In that footnote, the Supreme Court rejected the defendant's reference to former Corporation's Code section 834 (from which current Corp. Code, § 800 is derived), which provided safeguards such as posting an undertaking for suits by private shareholders. The court noted such safeguards were not necessary because trustees are fiduciaries with a special interest in the corporation that is different from private shareholders. The Supreme Court specifically stated it did not reach the question about whether minority directors of a private corporation could bring an action on behalf of the corporation. In that context, the court said "the differences between private and charitable corporations make the consideration of such an analogy valueless." (*Ibid.*) In any event, the *Holt* decision predated the enactment of the nonprofit corporation law by more than a decade.

27

a "person with a reversionary, contractual, or property interest in the assets subject to such charitable trust."  (§ 5142, subd. (a)(1)–(4).)  "Other than the Attorney General, only certain parties who have a special and definite interest in a charitable trust, such as a trustee, have standing to institute legal action to enforce or protect the assets of the trust."  (*Hardman v. Feinstein* (1987) 195 Cal.App.3d 157, 161–162 (*Hardman*) citing § 5142.)

Turning to the question of whether a continuous relationship is necessary, we look to *Grosset v. Wenaas* (2008) 42 Cal.4th 1100 where the Supreme Court held that California law "generally requires a plaintiff in a shareholder's derivative suit to maintain continuous stock ownership throughout the pendency of the litigation."  (*Id.* at p. 1119.)  The plaintiff in that case lost standing to continue a derivative action when he was required to sell his stock as part of a merger.  (*Id.* at p. 1104.)  The court observed the authority to manage the business and affairs of a corporation, including commencing, defending, and controlling actions on behalf of the corporation, is vested in the board of directors.  (*Id.* at p. 1108 citing *A. Paladini, Inc. v. Superior Court of San Francisco* (1933) 218 Cal. 114, 121; see also § 300, subd. (a) ["the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board"].)

Shareholders are permitted under section 800 to bring a derivative suit to enforce the corporation's rights and redress injuries if the board fails to do so.  (*Grosset*, *supra*, 42 Cal.4th at pp. 1108, 1110.)  The action is derivative because the " ' "gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among the individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." ' "  (*Id.* at p. 1108.)

28

Only the corporation obtains recovery from a successful derivative suit. (*Ibid.*)

The *Grosset* court examined section 800's language stating that no derivative action on behalf of a corporation may be "instituted or maintained" unless "the plaintiff was a shareholder, of record or beneficially . . . at the time of the transaction or any part thereof of which plaintiff complains" or "devolved upon plaintiff by operation of law from a holder who was a holder at the time of the transaction . . . ." (*Grosset*, *supra*, 42 Cal.4th at p. 1110.) The court concluded that nothing in either the text or the legislative history of the statute indicated "that the Legislature rejected a continuous ownership requirement, or that construing the statute to include such a requirement would be contrary to legislative intent." (*Id.* at p. 1113.)

The *Grosset* court commented that the "instituted or maintained" language "seems to point to a continuous ownership requirement," but this language "does not clearly impose it." (*Grosset*, *supra*, 42 Cal.4th at pp. 1113–1114.) However, the court concluded that "other considerations ultimately support" a continuous ownership requirement. Continuous ownership not only furthers the statutory purpose of minimizing abuse of derivative suits, "but the basic legal principles pertaining to corporations and shareholder litigation all but compel it." (*Id.* at p. 1114.)

"Because a derivative claim does not belong to the stockholder asserting it, standing to maintain such a claim is justified only by the stockholder relationship and the indirect benefits made possible thereby, which furnish the stockholder with an interest and incentive to seek redress for injury to the corporation. [Citations.] Once this relationship ceases to exist, the derivative plaintiff lacks standing because he or she 'no longer has a financial interest in any recovery pursued for the benefit of the

29

corporation.' " (*Grosset*, *supra*, 42 Cal.4th at p. 1114.) In other words, "allowing a plaintiff to retain standing despite the loss of stock ownership would produce the 'anomalous result that a plaintiff with absolutely no "dog in the hunt" is permitted to pursue a right of action that belongs solely to the corporation.' " (*Ibid*.) The court noted "the vast majority of other jurisdictions that have considered the issue require continuous stock ownership for standing to maintain a derivative lawsuit." (*Ibid*.) Consistent with these courts, the Supreme Court held section 800, subdivision (b) "is properly construed as containing a continuous ownership requirement." (*Id*. at p. 1115.)

The *Grosset* court rejected an argument that involuntary loss of stock should not result in lack of standing. The court stated, " '[p]laintiffs who lose their shares involuntarily have no greater interest in the continued well-being of a corporation than plaintiffs who willingly sell their shares.' " (*Grosset*, *supra*, 42 Cal.4th at pp. 1115–1116.) The Supreme Court commented in dicta that equitable considerations might warrant an exception to a continuous ownership requirement if a merger was fraudulent or used to "wrongfully deprive" a plaintiff of standing, but those issues were not before it. (*Id*. at pp. 1118–1119.)

In *Wolf*, we determined a director who was not reelected to serve on the board of directors lost standing to assert a statutory right to inspect corporate documents. (*Wolf*, *supra*, 185 Cal.App.4th at p. 919.) We rejected an argument that a director's inspection rights continue if he or she was in office when the inspection demand was made and when a lawsuit was filed. "When [the director] lost his seat on the board, he lost standing to assert recognized inspection rights, since they are intended to promote the appropriate exercise of a director's fiduciary duties." (*Id*. at p. 921.)

30

*Wolf* cited another decision of our court, *Tritek Telecom, Inc. v. Superior Court* (2009) 169 Cal.App.4th 1385, in which we "discussed the scope of directors' inspection rights, in terms of their intended function of promoting the directors' proper exercise of fiduciary duties to the corporation and shareholders." (*Wolf, supra*, 185 Cal.App.4th at p. 916 citing *Tritek*, at pp. 1390–1391 & § 309, subd. (a).) We held that a current director of a corporation "could lose the 'absolute' right to inspect corporate documents" subject to an attorney-client privilege when the director filed a shareholder action that was adverse to the corporation. (*Wolf*, at pp. 918–919 citing *Tritek*, at pp. 1390–1391.) The director's inspection rights were limited "because the director's loyalties [were] divided and documents obtained by a director in his or her capacity as a director could be used to advance the director's personal interest in obtaining damages against the corporation." (*Tritek*, at p. 1391.)

4. *Application*

Using similar prohibitory language as section 800, subdivision (b), section 5710, subdivision (b) states, "no action may be instituted or maintained in the right of any corporation by any member of such corporation" unless certain criteria are met, including the fact that plaintiff "was a member at the time of the transaction or any part thereof of which the plaintiff complains." As suggested by the Legislature, we apply the Supreme Court's interpretation of section 800, subdivision (b) in *Grosset* and similarly conclude section 5710, subdivision (b) requires continuous membership in the nonprofit public benefit corporation to bring a derivative action. As with general corporations, the derivative claim belongs to the nonprofit public benefit corporation.

31

To determine who constitutes a "member" for purposes of section 5710, subdivision (b), we look to the bylaws of the nonprofit public benefit corporation. In this case, section 3.1 of the Foundation's bylaws provide for only one class of voting members consisting of the individuals who comprise the board of directors. Turner's membership in the Foundation expired when she was not reelected and her term as a director expired. Since she no longer maintains an interest in the Foundation as a member she no longer has a " ' "dog in the hunt" . . . to pursue a right of action that belongs solely to the [nonprofit public benefit] corporation.' " (*Grosset*, *supra*, 42 Cal.4th at p. 1114.)

Likewise, we conclude Turner cannot maintain her causes of action under sections 5142, 5233, or 5223 based on her former position as a director and officer. Other than the Attorney General (or someone granted relator status by the Attorney General), each category of individuals specified in sections 5142 and 5233 is tethered to the corporation as a member, a fiduciary, or someone who holds a definite interest in the assets that are the subject of the charitable trust. Section 5223 allows removal of a director only "at the suit of a director" for "fraudulent or dishonest acts or gross abuse of authority or discretion with reference to the corporation or breach of any duty" arising under the statutory scheme. Each of these statutes are derivative in the sense that the gravamen of an action brought by an authorized individual seeks to obtain remedies on behalf of the corporation. (*Grosset*, *supra*, 42 Cal.4th at p. 1108.)

Just as a corporation manages its business and affairs through a board of directors (*Grosset*, *supra*, 42 Cal.4th at p. 1108; § 300, subd. (a)), a nonprofit public benefit corporation also acts through its directors. All "activities and affairs" of a nonprofit public benefit corporation are "exercised

by or under the direction of the board." (§ 5210.) In exercising this power, the directors must "perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner that director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (§ 5231, subd. (a).) If a director so performs his or her fiduciary duties, and subject to section 5233, there is "no liability based upon any alleged failure to discharge the person's obligations as a director, including, . . . , any actions or omissions which exceed or defeat a public or charitable purpose to which a corporation, or assets held by it, are dedicated." (*Id.* at subd. (c).) Therefore, the powers given to directors and officers under sections 5142, 5233, and 5223 promote the exercise of their fiduciary duties to the nonprofit public benefit corporation and require them to act in the best interest of the nonprofit.

As in *Wolf*, when Turner was not reelected as an officer or director, she no longer had fiduciary obligations to the Foundation and she lost her status and standing to justify continued pursuit of the causes of action on behalf of the Foundation. (*Wolf*, *supra*, 185 Cal.App.4th at p. 919.) Again, she no longer has a " ' "dog in the hunt" ' " to pursue remedies on behalf of the Foundation. (*Grosset*, *supra*, 42 Cal.4th at p. 1114.)[11]

We recognize that our colleagues in the Second District reached a different conclusion in *Summers v. Colette* (2019) 34 Cal.App.5th 361, 364

---

[11]    Because we conclude Turner is not qualified to pursue an action on behalf of the Foundation under section 5142, we need not reach Turner's argument that such an action could be brought against Victoria as trustee, in addition to her role as a director.

and determined a director of a nonprofit public benefit corporation who brought an action alleging self-dealing and misconduct by another director did not lose standing after the board removed her from her position as a director. The *Summers* court also concluded the trial court erred in that case by not granting leave to amend to add the Attorney General as an indispensable party after the plaintiff failed to give proper notice. (*Ibid.*)

We disagree with the *Summers* court's interpretation of the statutory language and legislative history as pointing away from a continuous directorship requirement for standing, for the reasons we have explained. (*Summers*, *supra*, 34 Cal.App.5th at pp. 369–370.) However, we note the *Summers* court was concerned with equitable considerations surrounding the removal of a director and the absence of notice to the Attorney General. These considerations are not before us.

The plaintiff in *Summers* was one of four directors for a nonprofit public benefit corporation. Summers filed an action against the corporation and another director " 'as a director on behalf of' " the corporation for self-dealing and misconduct by the other director. She alleged the other director treated the public benefit corporation " 'as her own personal fiefdom' " and engaged in acts of self-dealing and breaches of fiduciary duty. After Summers confronted the other director about her claims, the other director orchestrated a vote to remove Summers from the board. (*Summers*, *supra*, 34 Cal.App.5th at p. 364, including fns. 1 & 2.) However, the vote was not valid because it did not meet the requirements of the bylaws for a majority vote for involuntary removal. The trial court granted a temporary restraining order enjoining the corporation from conducting board meetings without notice to plaintiff. The board subsequently voted to remove Summers from the board at a properly noticed meeting in which she participated. (*Id.* at p. 365.)

34

Unlike the *Summers* plaintiff, Turner was not removed as a director under the Foundation's bylaws. She was simply not reelected at the board's annual meeting.

Turner's allegations that the other directors appeared hostile to her, tried to freeze her out, and did not nominate her because she initiated this litigation, are speculative contentions or conclusions of law that do not amount to a material factual pleading that her removal was wrongful. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [we treat a demurrer "as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law"].) "[N]ot being renominated is not exactly the same as being removed, and [the director's] term expired. [A former director's] allegations that [she] was removed for the sole purpose of avoidance of corporate . . . obligations amount only to contentions or conclusions of law that do not withstand demurrer." (*Wolfe, supra*, 185 Cal.App.4th at p. 921.)[12]

We are also not persuaded by the *Summer*'s court's analysis of the statutory purpose and public policy. The *Summer*'s court concluded that "a continuous directorship requirement would unnecessarily deprive the

---

[12] According to the operative pleadings, Turner first objected to the notion of settlement with Prebys's son in September 2016, at the same meeting when she was elected as president of the board. She voted against approving any settlement amount in December 2016. In March 2017, months after a settlement was reached with the son, Turner delivered a demand letter and draft petition challenging the board members' agreement to settle as an improper diversion of Foundation funds. The board took no action against Turner. Even after Turner filed her probate petition in May 2017, the board took no action against her. It was not until the annual board meeting in November 2017, eight months after the board first received a draft petition and more than a year after she first objected to settlement, that Turner was not renominated or elected to serve as an officer or director.

Attorney General and the public of the assistance of 'responsible individuals' wishing to pursue an action under the statutes" (*Summers, supra,* 34 Cal.App.5th at pp. 371–372) and minimize the potential for harassing litigation saying, "directors authorized to bring an action on behalf of a nonprofit corporation have been charged with managing the corporation's affairs, and those permitted to maintain and action in the absence of a continuous directorship requirement are sufficiently ' "few in number." ' " (*Id*. at p. 372.)  This analysis is too thin a reed upon which to lean in discarding ordinary standing requirements and does not sufficiently protect nonprofit public benefit corporations for reasons we next discuss.

5. *Policy Considerations*

We are mindful of the important contributions nonprofit organizations make to nearly every aspect of American life "whether they are provided by religious institutions, schools and colleges, human and social resource agencies, cultural and arts organizations, medical and scientific research facilities, or humanitarian organizations.  In addition to the specific contributions, the sector serves as a counterbalance to government and to the private realm, supplementing their public and private activities, filling in the gaps in services that neither meet, while using its unique position to innovate in delivering services and providing facilities for the general good." (Freemont-Smith, Governing Nonprofit Organizations:  Federal and State Law and Regulation (2004) (hereafter Governing Nonprofit Organizations) p. 1; Blasko, *Standing to Sue in the Charitable Sector* (1993) 28 U.S.F. L.Rev. 37 (hereafter *Standing to Sue*) ["Charities have a profound and positive role in American society"].)

Because the nonprofit sector "is a vital component of our democratic society" it must be "allowed the greatest degree of freedom to operate,

36

consistent with the need to assure the public of its integrity." (Governing Nonprofit Organizations, at p. 2.) "Philanthropy in the United States has been claimed . . . to be 'our freest enterprise' " and the dominant policy of the states and federal government since colonial times has been to afford freedom of action to the managers and directors of charitable funds, who act on behalf of the charitable entity as fiduciaries. (*Id.* at p. 53.) "The problem faced by the courts in deciding the grounds on which to permit an interested party to bring suit to enforce a charity is, of course, the need to strike the difficult balance between the desire to assure that abuses will be corrected and the desire to permit fiduciaries to function without unwarranted abuse and harassment." (*Id.* at p. 333.)

Since the beneficiaries of charities and nonprofit public benefit corporations are the public at large, the attorney general has historically been "the protector, supervisor, and enforcer" of these organizations. (Bogert's, The Law of Trusts and Trustees (2021) Power to Enforce–Rights on Failure or Breach, § 411. The attorney general as the protector, supervisor, and enforcer of charitable trusts, Governing Nonprofit Organizations, at pp. 54, 301.) The attorney general may pursue cases for breach of duty "as representative of the sovereign, rooted in the common law power of *parens patriae*. It has been traditionally recognized that the suit may be either on the [a]ttorney [g]eneral's own initiative, or on the relation of (ex relatione) an interested citizen who has brought the alleged breach to the attention of the [a]ttorney [g]eneral and demanded action." (Bogert's, § 411, pp. 11-12.) Enforcement primarily by an attorney general addresses pragmatic concerns that "charities would be embroiled in 'vexatious' litigation, constantly harassed by suits brought by parties with no stake in the charity. Trustees who administer a public charity should not be called upon to answer to

37

private and therefore presumably disinterested, parties. . . . The concern that the corpus of the charity might be dissipated in litigation also has encouraged standing limitations, and for the public good courts try to protect charitable resources so that charitable dollars can be spent on the charity's philanthropic purpose." (*Standing to Sue*, pp. 41–42.)

California law is consistent and gives the Attorney General "primary responsibility for supervising charitable trusts . . . and for protection of assets held by charitable trusts and public benefit corporations." (Gov. Code, § 12598, subd. (a); *Holt*, *supra*, 61 Cal.2d at p. 754 ["the Attorney General has been empowered to oversee charities as the representative of the public"].)

We recognize, however, that there are practical limitations on the resources of the Attorney General to provide investigative oversight of the nearly 114,000 registered charitable organization and additional unregistered organizations holding charitable assets in California. Staffing and funding limitations may prevent the Attorney General from prosecuting all of the complaints it receives. (*Standing to Sue*, at p. 48.) Additionally, political concerns may discourage "investigation of charges against respectable trustees and corporate officers." (*Ibid.*)

The California statutory scheme addresses these practical concerns by allowing litigation on behalf of a public benefit corporation by a defined class of individuals in addition to the Attorney General. The statutes also provide a mechanism for continued protection of the public benefit corporation if someone who was once within the defined class of individuals entitled to litigate on its behalf loses his or her status with the corporation and, thereby, standing.

A public benefit corporation, such as the Foundation, may continue to seek relief for claims of misconduct against its directors through the Attorney

General, or through an individual to whom the Attorney General grants relator status under sections 5142, subdivision (a)(5) and 5233, subdivision (c)(4), even if a qualified individual who initiated suit on behalf of the corporation loses standing during the litigation.[13]

" ' "A relator is a party in interest who is permitted to institute a proceeding in the name of the People or the attorney general when the right to sue resides solely in that official. . . ." ' " (*Arman v. Bank of America, N.T. & S.A.* (1999) 74 Cal.App.4th 697, 705, fn. 12; see Cal. Code Regs., tit. 11, §§ 1–2 (Lexis Advance through Register 2021, No.28, July 9, 2021).)  If the Attorney General deems it appropriate to grant relator status to an individual, such as a former director, to litigate the matter on behalf of the public benefit corporation, the relator is responsible for all costs and expenses incurred in the prosecution of the matter.  (Cal. Code Regs., tit. 11, § 6.)  This is consistent with the common law where relators were liable for costs to protect charities and the state from vexatious suits.  (Bogert's, § 411, p. 13.)  This cost-shifting mechanism addresses the limited public resources of the Attorney General and operates as a pragmatic check on an individual pursuing his or her personal interests over those of the public benefit corporation.

Moreover, the Attorney General is charged with oversight of the relator proceedings, which serves as an additional check against any retaliatory or harassing litigation tactics by a person who no longer holds a distinct and special relationship with the corporation.  (Cal. Code Regs., tit. 11, § 8 ["The Attorney General may at all times, at any and every stage of the said proceeding, withdraw, discontinue or dismiss the [relator's status], as to him

___

[13]    The Attorney General may also seek removal under section 5223, subdivision (b) of any director who breached their duties.

may seem fit and proper; or may, at his option, assume the management of said proceeding at any stage thereof.")  "In principle, the use of a relator allows the attorney general to bring suit in absentia–to draw upon private resources for the conduct of the suit, but simultaneously retain ultimate control of the proceeding."  (*Standing to Sue*, at p. 49.)  California's relator statute and regulations expand "the availability of relator actions . . . , which may encourage 'public spirited citizens' to supplement the attorney general's efforts while still protecting the charity from frivolous suits."  (*Id*. at p. 50.)

The Attorney General filed an amicus brief in support of Turner's position on appeal, relying primarily on *Summers*, but without acknowledging the different factual posture presented here.  The Attorney General cites practical limitations on the Attorney General's enforcement powers such as lack of resources to investigate every complaint and the ability to become aware of wrongful conduct or be sufficiently familiar with the situation to appreciate its impact.  The Attorney General states there is no meaningful distinction between a director who sues on behalf of a nonprofit public benefit corporation and one who sues but is not reelected in terms of their ability to represent the nonprofit public benefit corporation.  We are not persuaded by the Attorney General's appellate position.

Unlike in *Summers* or *Holt*, there is no concern here that the Attorney General " 'may not be in the position to become aware of wrongful conduct or to be sufficiently familiar with the situation to appreciate its impact . . . .' "  (*Summers*, *supra*, 34 Cal.App.5th 371 quoting *Holt*, *supra*, 61 Cal.2d at p. 755.)  Turner informed the Attorney General of her concerns even before she commenced the probate action.  As required by statute, the Attorney General had notice of both the probate and civil actions, has been involved in these cases since the beginning, and is well aware of the issues.

40

After the ruling by the civil court, the probate court inquired about the Attorney General's intention with respect to this matter. The deputy Attorney General stated they were "aware of the allegations being made here, and it is completely on our radar. We have not filed anything. If we are to file something, it would likely . . . be our own petition and complaint." The court asked if the Attorney General would come into the case if Turner was not able to proceed, commenting that the Attorney General "would perhaps be in a position to vindicate the interests of whatever charities lost out of the $15 million . . . ." The deputy Attorney General stated, "If my office does determine that a petition or complaint is necessary, we would absolutely file that." To date, however, the Attorney General has not filed a separate petition or granted Turner relator status.

Where, as here, an individual with statutory standing initiates an action on behalf of a nonprofit public benefit corporation and provides the Attorney General with adequate notice of the matter, we see no public policy concerns with imposing ordinary standing principles if that person loses standing during the litigation. The Attorney General, or someone to whom the Attorney General grants relator status, may step into an existing action or initiate a separate action, if warranted.[14] The Attorney General should not be able to avoid its ongoing obligations to supervise charitable organizations simply because a director begins a lawsuit.

Under our interpretation, the statutory scheme adequately protects the nonprofit public benefit corporation and its beneficiaries from gamesmanship or improper attempts by the accused directors to terminate litigation brought under the statutory scheme. It gives the Attorney General primary

---

[14] The Attorney General has 10 years to commence an action from the date of its accrual. (Gov. Code, § 12596, subd. (b).)

responsibility for oversight where it has historically rested, but also allows the Attorney General to grant relator status, if appropriate and in the public interest, to an individual who may continue litigating on behalf of the public benefit corporation. The rules requiring oversight of a relator and requiring the relator to bear the costs, serve as a check against vexatious litigation. This minimizes the risk that a nonprofit public benefit corporation and its directors could become embroiled in expensive retaliatory or harassing litigation by a disgruntled individual who no longer has a "dog in the hunt." (See *Redevelopment Agency of San Diego v. San Diego Gas & Electric Co.* (2003) 111 Cal.App.4th 912, 921 [a purpose of the standing requirement is "to protect a defendant from harassment"].) On the other hand, allowing perpetual standing to an individual who no longer stands in a definite and special relationship with the nonprofit public benefit corporation, such as a director or officer who is constrained by fiduciary duties, would not protect the corporation from suits continued in bad faith or for harassment. A person who is no longer tethered to the charitable organization by such a relationship or acting under the supervision of the Attorney General could divert the board and the organization's resources from the organization's charitable purpose by pursuing litigation for personal interests rather than the best interest of the corporation. (Governing Nonprofit Organizations, at p. 449 [broadening standing rules "will encourage frivolous suits that will divert fiduciaries and deplete charitable funds in the defense of lawsuits" and "encourage disaffected persons . . . or disgruntled members of the public, to use the courts to attempt to force trustees and directors to take desired courses of action."].)

We in no way imply that Turner is a disgruntled or disaffected person who continued this litigation in bad faith after she lost her position as a

42

director and officer. However, not all nonprofit public benefit corporations are as generously endowed as this one and a significant and potentially devastating risk exists that a person who no longer stands in a definite or special relationship to the charity could engage in harassing litigation tactics to such an extent that it would cripple the organization's ability to fulfill its charitable purpose.

C. *Special Interest Standing*

Finally, Turner contends she has special interest standing to proceed against the trustee based on her role on the Trust's real estate committee. In her operative civil complaint, Turner alleged she "holds a fiduciary role on the Trust's two-member Real Estate Committee" and on this committee she "has authority to decide how the real estate assets comprising the bulk of the residual trust estate are handled, and thus how the Foundation is funded."[15]

At the final hearing before the probate court, Turner's counsel raised the issue of whether Turner's role as a member of the Trust's real estate committee provided her with standing. The court commented that a separate

---

[15] This allegation is not included in the operative probate petition. However, the restated trust declaration was lodged with a confidential trust coversheet and includes the provisions regarding Turner's appointment to the real estate committee. According to the trust declaration, "The trustee may not sell any real estate assets without the approval of the Real Estate Committee. In addition, the Real Estate Committee shall advise the trustee about the management of real property and related assets." Other than approving the sale of real estate assets, the committee's "role shall be only advisory. The trustee shall still have the fiduciary duty of a trustee under the terms of this instrument and under California law, and the Real Estate Committee shall not be liable to any person for their advice or lack of advice about any trust matter. Correspondingly, the trustee shall not be liable to any person for decisions made by the Real Estate Committee concerning any sale or non-sale of real estate assets."

43

petition seeking redress could be presented regarding the real estate committee and trust administration. Turner's counsel did not disagree, but asserted that Turner's role on the real estate committee gave her "special interest" standing to proceed with her claims on behalf of the Foundation. Turner concedes she did not fully develop this argument before the probate court.

We do not believe she has developed this argument on appeal either and we are not persuaded she has any special interest to pursue this matter, as currently pled. Turner relies upon the Restatement Third of Trusts, section 94(2), which states, "A suit for the enforcement of a charitable trust may be maintained only by the Attorney General or other appropriate public officer or by a co-trustee or successor trustee, by a settlor, or by another person who has a special interest in the enforcement of the trust." She also cites Restatement Third of Trusts, section 94(2), comment g(2), stating the terms of a charitable trust may confer upon individuals other than the beneficiaries the power to enforce a trust or the power to control or advise the trustee and such powers may give the person holding those powers special interest standing to enforce the trust. Finally, Turner cites *Crocker-Citizens National Bank v. Younger* (1971) 4 Cal.3d 202, which involved a trust advisory committee to designate charitable institutions to receive distributions at intervals stated by the trust. (*Id*. at pp. 206–207.) In that case, the court commented that "rules pertaining to the rights and duties of trustees generally would be broadly applicable to trust advisors or other persons holding trust powers, such as the members of the committee herein. 'Trust advisers with powers of direction must be considered fiduciaries.' " (*Id*. at p. 211.) However, it also stated that "trustees are bound by the terms of the trust and possess only that authority conferred upon them by the trust."

44

(*Ibid.*)  The *Crocker-Citizen's National Bank* court ultimately concluded that a committee member's appointment to a trust committee was void as an unlawful deviation from the terms of the trust.  (*Id.* at p. 213.)

This smattering of authorities is not helpful.  Whether these authorities potentially support an argument that Turner has an advisory role or fiduciary duty to *the Trust* that would enable her to raise concerns with respect to the administration of the trust, is not an issue before us.

The issue before us is whether Turner has a special and definite interest *in the Foundation* to pursue a derivative claim on its behalf. (*Hardman*, *supra*, 195 Cal.App.3d at pp. 161–162.)  Turner's role on the Trust's real estate committee simply does not fall within the statutorily defined categories of individuals with a special or definite connection *to the Foundation* who may pursue an action on its behalf under sections 5142, 5233, 5223, or 5710.

The statutes themselves codify and define the categories individuals who have a sufficiently special interest in a nonprofit public benefit corporation to allow them to litigate an action on behalf of the corporation: an officer of the corporation, a director of the corporation, the corporation itself or a member of the corporation, or a person with a reversionary, contractual, or property interest in the assets subject to such charitable trust. (§§ 5142, subd. (a)(1)–(4), 5223, subd. (a), 5233, subd. (c)(1)–4); 5710, subd. (b)(1).)

Bogert's The Law of Trusts and Trustees, section 414, an authority Turner cites for the special interest doctrine, comments that "courts have permitted private individuals, whose positions with regard to the charitable trust were more or less fixed, to sue for its enforcement."  The supporting note cites our decision in *Boy Scouts*, saying "plaintiff had standing to bring

45

the action on behalf of Boy Scouts who were beneficiaries of the trust." (*Id*. at pp. 51–52, citing *Boy Scouts*, *supra*, 14 Cal.App.3d at pp. 195–196.) In *Boy Scouts*, we relied on *Holt*, which permitted minority trustees of a charitable corporation to maintain an action against majority trustees to enjoin a threatened breach of trust. (*Holt*, *supra*, 61 Cal.2d at pp. 756–757.) In both instances, the plaintiffs had a definite interest directly connected to the charitable organization. These authorities also predate the enactment of the statutes pertaining to nonprofit public benefit corporations in California, which, as we have discussed, expanded and defined the scope of individuals who can pursue derivative actions on behalf of nonprofit public benefit corporations, in addition to the Attorney General. A commentator who surveyed authorities from other states noted courts allow standing "to enforce a charity" by a beneficiary, a fiduciary, a trustee, or a director of the charitable corporation. (See Governing Nonprofit Organizations, *supra*, p. 334.) This is consistent with California's statutory scheme.

Turner has not alleged her role on the Trust's real estate committee makes her a fiduciary of *the Foundation* or a beneficiary of its assets. She also does not explain how she could amend her pleadings to allege that her advisory role on the real estate committee gives her any corporate or fiduciary powers *with the Foundation* or any other special connection *to the Foundation's assets* that would allow her to litigate a derivative action on its behalf.[16] Even if the Trust's real estate committee makes financial decisions

---

16    " ' "The burden of proving such reasonable possibility is squarely on the plaintiff." ' " (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 618.) "To satisfy this burden, ' "a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading' " ' by clearly stating not only the legal basis for the amendment,

regarding the Trust's real estate that ultimately result in moneys to fund the Foundation, as currently pled, any connection between Turner's role on the Trust's real estate committee and the Foundation is too attenuated to give Turner special interest standing to continue this action on behalf of *the Foundation.*

DISPOSITON

The judgments are modified to indicate that the dismissals are entered against Turner in her capacity as a former director and officer of the Foundation and, as modified, are affirmed. However, the portions of the judgments denying leave to amend are vacated. The matter is remanded with directions for the probate and civil courts to enter new orders sustaining the demurrers, but granting 60 days leave to amend, limited to the issue of whether a proper plaintiff may be substituted to continue this action consistent with the holdings of this decision. Respondents shall recover their costs on appeal.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.

---

but also the factual allegations to sufficiently state a cause of action." (*Ibid.*; accord, *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.)